## BLIM v. UNITED STATES.
### No. 5083.

Circuit Court of Appeals, Seventh Circuit.
Jan. 20, 1934.

Rehearing Denied Feb. 26, 1934.

Edward J. Hess and John Elliott Byrne, both of Chicago, Ill., for appellant.

Leslie A. Salter, of Chicago, Ill., for the United States.

Before ALSCHULER, SPARKS, and FITZHENRY, Circuit Judges.

FITZHENRY, Circuit Judge.

This is an appeal from a judgment and sentence of the District Court, on October 3, 1933, for contempt of court, upon a finding that appellant, while a witness before the grand jury, had failed to testify truthfully, and by said failure had obstructed and was obstructing justice in the court. Appellant was sentenced to imprisonment in the county jail for a period of three months, with the privilege of purging himself of said contempt within ten days by fully, freely, and truthfully testifying.

On July 31, 1933, the grand jury for the Northern district of Illinois, Eastern division, was investigating "whether one William H. Malone had committed certain violations of the Internal Revenue and Income Tax Laws of the United States within three years last past," etc. Appellant was called as a witness and testified fully. The grand jury for the July term did not complete its investigation

and was ordered by the court to continue. On September 25th the grand jury returned a presentment to the court, charging "that the answers which said witness made to the questions propounded to him were evasive, false and misleading, with a deliberate and wilful intent to withhold the true facts within his knowledge and to hinder, block and delay the inquiry of this grand jury and to obstruct the due process of the Federal court and the administration of justice, as will more fully appear from the transcript of his testimony before this grand jury, which is hereto attached, made a part hereof and marked Exhibit 'A.' "

The witness was called before the court on September 26, 1933, and ordered to appear again before the grand jury and make full, true, and complete answers to the matters concerning which he had heretofore been questioned, and particularly to make full, true, and complete answers to the following questions:

"(1) With respect to a fee check from Huff & Cook for $12,500 on October 18, 1927:

"Now what was the purpose of drawing out $7,500 in cash, Mr. Blim?

"And what did you do with it?

"You deny that you turned that $7,500 over to Mr. Malone?"

Appellant, in obedience to the order of the court, again appeared before the grand jury and gave practically the same testimony he gave on July 31st, when he told the grand jury that he did withdraw from his bank account $7,500, but did not pay it to Malone. He again explained what he had done with the $7,500 and why he withdrew it. He was meticulously cross-examined with reference to his use of the currency. The grand jury concluded that the answers were false, and returned a second presentment on September 27th, to which was attached Exhibit A, being a transcript of his evidence given in compliance with the order of the court.

Appellant was called before the court and required to plead. He pleaded not guilty to the second presentment, but, undoubtedly upon the theory that he had complied with the order of the court made upon its consideration of the first presentment, he stood mute as to it, and the court entered a plea of not guilty for him. Then, on motion of appellant, the hearing was continued until the next day. The evidence contained in the two Exhibits A was to the following effect:

William H. Malone owned or controlled the American-Mexican Refining Company, a corporation dealing in fuel and road oils, etc. For a period of eight years prior to May 1, 1927, appellant had been in his employ and acted as secretary-treasurer of the corporation, at a salary of $6,500 per annum. Malone was a member of the state board of equalization, and also of its successor, the Illinois tax commission. In addition to his services as secretary-treasurer of the corporation, Blim advised Malone on many legal matters which came up, on questions involving assessments, and acted in the capacity of a confidential secretary. Blim checked assessments and did the general overseeing of agents, clerks, and books of both the state board of equalization and the tax commission, so that none of the assessments would be changed. There was a disposition on the part of some of the members of the board, as well as, later, some of the members of the commission, to kill assessments as favors to personal friends and political associates. Files had been found missing, etc. Appellant established a permanent record of all assessments and kept a personal record, for Malone, of everything the commission did, so there would be no tendency to tamper with the records. He received no salary for that work, as he considered his salary from the corporation covered all his time.

Appellant is a lawyer. He was permitted to and did practice some during his employment by Malone. He had nothing to do with Malone's financial affairs, except in connection with real estate transactions at times. On May 1, 1927, he left Malone's employ at the instance of the law firm of Huff & Cook and re-engaged in the practice of his profession. He was led to take this action at the instance of Mr. Cook, who told him, if he could save the Surface Lines something on its taxes, he (Cook) could get the business, and asked Blim to look over the situation to see if he thought they could render valuable services to the Surface Lines. Blim investigated the assessments and reported he believed it would be possible to save the Surface Lines at least a million dollars in its assessments. Huff & Cook procured the business and Blim became associated with the firm in that work.

A lawsuit involving appellant's client was tried before Judge Arnold in the circuit court of Cook county. It took several days. After hearing the evidence, Judge Arnold took the case under advisement and made a finding in favor of appellant's client, resulting in a substantial reduction in the assessment of the property.

On October 18, 1927, the fee was collected by Huff & Cook and a check for $12,500, representing his share, delivered to Blim. The check was deposited in the Home Bank & Trust Company. After waiting a few days for the check to clear, on October 20th Blim cashed his own check for $7,500. He was asked why he withdrew that amount of currency and whether or not he gave it to Malone. He answered clearly and positively that he did not give it to Malone, and then followed the cross-examination as to what he did with it.

The gist of his explanation was that a child was born to his wife October 15, 1927, at St. Ann's Hospital on the west side of Chicago; that she had an unusually severe experience; that at some prior time he and his wife had been discussing the coming of the child and he was much worried because his financial status was not good, but that his wife had said, "Well, I know the good Lord will provide, and I am not going to worry"; that during her experience in the hospital this fee was collected, and on October 20 he drew out the $7,500 and took it to the hospital and gave it to his wife in order to give her a feeling of security; that she laughed at him, told him he was foolish, and should not have done it and to take the money back and take care of it; that he took the money back, put it in the vault at his office, and that it was spent from time to time buying oriental rugs, remodeling and redecorating the home inside, making extensive repairs of various kinds, and purchasing supplies; that the family spent liberally during the Christmas season of 1927—he bought a diamond pendant for his wife, furnished money to buy Christmas presents for the five children, and the older ones gave presents to each other; that in all he spent in remodeling and refitting his home between $8,000 and $10,000; and that some of the money which he had placed in the vault was later redeposited in the bank and some put in a safety deposit vault, designated by the witness.

In the course of the examination it developed that when Blim's own income tax return was being checked up he explained this whole story to the revenue agent who investigated it, and who took a written statement from him. In the grand jury room, when asked to tell what he did with the $7,500, he told the examining attorney that he had explained all that to him and he would rather not testify before the grand jury as to his family affairs; whereupon he was instructed to tell his story to the grand jury. He said he did not want to tell it because it sounded sentimental and foolish, but, upon the insistence of the Assistant United States Attorney, Blim told the story again to the grand jury. The grand jury did not believe the story; hence the first presentment.

On September 27th, in obedience to the order of the court, Blim appeared again before the grand jury. Upon this examination he went more into detail than in the first examination with reference to what had been done with the $7,500 in question. He gave the names of the people from whom he bought rugs and material and their addresses in Chicago. He told who the other persons in the office were who might have access to the vault where the money was kept, and how one of the merchants had closed his place of business on Milwaukee avenue and moved to a new address, giving it to the grand jury. Where he could not speak positively as to detailed expenditures, he said if they would give him a little time he would collect the exact information and furnish it; but no time was given. He gave the name and address of a company on Fullerton avenue through whom he had procured the services of the decorators to redecorate his house.

From this recital of facts it will appear that Blim told his story at least four different times. If it was false in any part, it could have been readily checked up, and that fact brought to the attention of the grand jury and the court. At the conclusion of his examination the following colloquy took place:

"Q. Did you ever pay any money to Malone? A. I did not.

"Q. Not a dime? A. Not a dime, no, sir.

"Q. Did you give him $7,500 in currency approximately at the time you got this fee? A. No, sir.

"Q. In 1927? A. No, sir, I did not, because he did not help us on that matter. He would not be entitled to a thing. We had to go into court that year and undo what damage they did to us in the Tax Commission.

"Q. Then you say positively you never paid any money to Malone? A. That is right.

"Q. Not at any time? A. That is right. You mean in connection with tax matters? I have done work with him and for him with real estate transactions, and may be I have collected money for him as an attorney which I had paid to him as collections, and things of that kind. But in the way of fees, or anything like that, no, never, not a cent.

"Q. Did you ever turn $7,500 in currency over to Malone? A. I did not, no, sir."

Upon the hearing September 28th, the government offered in evidence the two Exhibits A—the transcripts of appellant's testimony before the grand jury attached to the respective presentments—and then rested. Appellant moved the court to find him not guilty, which was taken under advisement. Appellant then announced he would offer no evidence and renewed his motion for a finding of not guilty, and the cause was continued for consideration and disposition until October 3d, when the court found appellant guilty and sentenced him as above recited.

It seems that notwithstanding all of the positive facts to which appellant testified, including names and addresses of the concerns and persons with whom he did business in and about purchasing materials, furnishings, and work in remodeling his home, there was no witness brought before the grand jury or presented in court to show that any statement made by appellant was false.

The material part of the inquiry was whether or not appellant had given $7,500 to William H. Malone out of a fee he collected on October 18, 1927, and as to that fact he answered clearly, unmistakably, and promptly. If appellant had not paid the $7,500 to Malone, then, of course, what he, his wife, and children had done with the money, and how he kept it, was wholly immaterial, and the examination was only appropriate for the purpose of satisfying the examining Assistant United States Attorney that he had fully discharged his duty.

The sole evidence relied upon to sustain a conviction here is what Blim said he did with the money. Without question his story is enough to put the United States Attorney and the government upon inquiry; but, standing alone, unaided by extraneous facts, it does not show that the plain, positive statements which he made were false or evasive, or that his conduct in testifying was contumacious, for all those statements may and could have been true. It is admittedly true that they disclose a line of conduct of one who was highly sentimental, but the whole story was not inherently improbable or necessarily unreasonable.

A bit of evidence which tends to give verity to the testimony of the witness is his statement after he had testified he had never given Malone a dime and when asked directly whether he had given Malone $7,500 at or about the time he received this fee in 1927: "No, sir, I did not, because he did not help us on that matter. He would not be entitled to a thing. We had to go into court that year and undo what damage they did to us in the Tax Commission." The case referred to had been tried before Judge Arnold, in a court of record, and, if Blim's statement was untrue, that fact could readily have been shown; and if there had not been a judicial hearing resulting favorably to appellant's client, or the statement was otherwise false, the public records were available to show that fact; yet the statement stands wholly uncontradicted. There was not the slightest evidence offered to show that Malone in fact deposited $7,500 in the bank the next day or approximately at the time Blim withdrew the $7,500 which he said he took to the hospital and tendered to his wife. That fact was simply injected into the examination by the attorney, and, if it was true, it might have been shown; but the government elected to stand by its prosecution solely upon the character of Blim's story.

In this case it was the theory of the government that, when appellant answered he had not paid $7,500 to Malone, his answer was false, and, therefore, the recital of the tender of the $7,500 to his wife under the circumstances disclosed was an obstruction of justice and in violation of the positive order of the court. If his statement that he did not give Malone the money was true, then, of course, there was no contumacious conduct or disobedience of the court's order.

What this court said in Jones v. United States, 209 F. 585, 587, is especially applicable to the case at bar: "Under the authorities, the present contempt proceeding, having been entitled as such and brought here on writ of error and being entirely punitive in its character, is criminal in its nature, and respondent was clothed with the presumptions that obtain in a criminal prosecution. He was presumed innocent until that presumption was overcome and his guilt established beyond a reasonable doubt. Gompers v. Buck's Stove & Range Co., 221 U. S. 418, 31 S. Ct. 492, 55 L. Ed. 797, 34 L. R. A. (N. S.) 874; Boyd v. United States, 116 U. S. 616, 6 S. Ct. 524, 29 L. Ed. 746."

In the same case the court quoted from Coffin v. United States, 156 U. S. 432, 458, 15 S. Ct. 394, 404, 39 L. Ed. 481, concerning the presumption of innocence wherein the Supreme Court said: "Now, the presumption of innocence is a conclusion drawn by the law in favor of the citizen, by virtue whereof, when brought to trial upon a criminal charge, he must be acquitted, unless he is proven to be guilty. In other words, this presumption is an instrument of proof created by the law in favor of one accused, whereby his innocence

is established until sufficient evidence is introduced to overcome the proof which the law has created."

This doctrine has repeatedly been applied in this court. Dalton v. United States (C. C. A.) 154 F. 461; Garrigan v. United States (C. C. A.) 163 F. 16, 23 L. R. A. (N. S.) 1295; Jones v. United States, supra.

■ The trial judge filed a written memorandum in support of his findings and holdings in this case, in which he said: "The court has read the testimony of respondent several times and is compelled to say that it does not believe that testimony." The statement goes to the heart of this case. In United States v. McGovern (C. C. A. 2) 60 F.(2d) 880, loc. cit. 889, which was similar to the instant case in many respects, the court said: "But the power to punish for contempt does not reside in the court to compel a witness to testify in accord with the court's conception of the truth."

In that case the court also said: "* * * Where the court is not justifiably convinced that the performance of its duties has been obstructed, it cannot act under the contempt power even though perjury has been committed."

In Ex parte Hudgings, 249 U. S. 378, 39 S. Ct. 337, 63 L. Ed. 656, 11 A. L. R. 333, a situation very similar to the case at bar was considered by the United States Supreme Court. In the Hudgings Case the alleged contumacious witness was called to testify in open court. The witness was recalled by the government for the purpose of proving by his testimony the handwriting of two persons there involved. On being shown the writing referred to, in answer to questions by the government, he said that from having often seen the writing of the persons named the writings shown were theirs, but he could not so state from having seen the two persons write, because he could not recollect ever having seen them do so. The trial court very pointedly questioned the witness on the subject of his recollection, and in view of his persistency in declaring he could not swear from knowledge obtained from a recollection of having seen the persons write or sign that the writings were theirs, and because of the apparent unwillingness of the witness to answer as court and counsel thought he should, the court allowed the government the widest latitude in examination. It covered a wide field as to the previous association of the witness with the parties in question and other circumstances deemed to positively establish that his connection with them had been such that his statement that he could not remember having seen them write was untrue. The alleged contumacious witness clung to his story. While the alleged contumacious conduct in the Blim Case was before the grand jury, the situation is very similar in effect to the Hudgings Case. In considering that case the court said (loc. cit. 382 of 249 U. S., 39 S. Ct. 337, 339): "That the contumacious refusal of a witness to testify may so directly obstruct a court in the performance of its duty as to justify punishment for contempt is so well settled as to need only statement. Despite some confusion, * * * it is indisputable that the punishment for contempt was imposed solely because of the opinion of the court that the witness was willfully refusing to testify truthfully, that is, was committing perjury."

The above quotation from the Supreme Court opinion describes this case accurately. Then the court proceeds: "Whether, then, power to punish for contempt exists in every case where a court is of the opinion that a witness is committing perjury, is the test we must here apply. Because perjury is a crime defined by law and one committing it may be tried and punished does not necessarily establish that when committed in the presence of a court it may not, when exceptional conditions so justify, be the subject-matter of a punishment for contempt. * * * This being true, we must ascertain what is the essential ingredient in addition to the elements constituting perjury under the general law which must be found in perjury when committed in the presence of a court to bring about the exceptional conditions justifying punishment under both."

After discussing the power to punish for contempt which resides in a court, being given it to secure judicial authority from obstruction in the performance of its duties, then the court proceeds to discuss the subject of the obstruction to the performance of judicial duty, the characteristic upon which the power to punish for contempt must rest. Then the court said (loc. cit. 383 of 249 U. S., 39 S. Ct. 337, 339):

"This being true, it follows that the presence of that element must clearly be shown in every case where the power to punish for contempt is exerted—a principle which, applied to the subject in hand, exacts that in order to punish perjury in the presence of the court as a contempt there must be added to the essential elements of perjury under the general law the further element of obstruction to the court in the performance of its duty. * * * It is true that there are decided cases which

treat perjury, without any other element, as adequate to sustain a punishment for contempt. But the mistake is, we think, evident, since it either overlooks or misconceives the essential characteristic of the obstructive tendency underlying the contempt power, or mistakenly attributes a necessarily inherent obstructive effect to false swearing. If the conception were true, it would follow that when a court entertained the opinion that a witness was testifying untruthfully the power would result to impose a punishment for contempt with the object or purpose of exacting from the witness a character of testimony which the court would deem to be truthful; and thus it would come to pass that a potentiality of oppression and wrong would result and the freedom of the citizen when called as a witness in a court would be gravely imperiled.

"Testing the power to make the commitment which is under consideration in this case by the principles thus stated, we are of opinion that the commitment was void for excess of power—a conclusion irresistibly following from the fact that the punishment was imposed for the supposed perjury alone without reference to any circumstance or condition giving to it an obstructive effect. Indeed, when the provision of the commitment directing that the punishment should continue to be enforced until the contempt, that is, the perjury, was purged, the impression necessarily arises that it was assumed that the power existed to hold the witness in confinement under the punishment until he consented to give a character of testimony which in the opinion of the court would not be perjured."

In the Blim case the court sentenced the respondent to the county jail for a period of three months, with the privilege of purging himself of said contempt within ten days by fully, freely, and truthfully testifying. The sentence in the Blim case is not exactly like the sentence in the Hudgings Case, as Blim is given a definite sentence, with the privilege of purging himself within ten days by testifying truthfully, according to the court's conception of the truth.

As has been said, the character of Blim's explanation of what he did with the $7,500 after he had taken it to his wife at the hospital justified the government in a rigid cross-examination, and, while highly sentimental, the things there detailed could have been true. On the other hand, if his answer that he had not paid the money in question at the time to Malone was true, there was no obstruction of judicial authority, and the court was wholly without authority to punish Blim for con-

tempt. If it were otherwise, a potentiality of oppression and wrong would result which would be even more far reaching than to imperil a witness called to testify in a court or before a grand jury. It might hazard the respectability of wholly innocent persons.

When one considers, as we must, the testimony shown by the two Exhibits A attached to the respective presentments in the light of the presumption of innocence, it is clear that the evidence does not show that Blim was guilty beyond a reasonable doubt. The motion of appellant made at the close of the evidence in the District Court to find appellant not guilty should have been allowed. The judgment must be and is reversed, with direction to discharge appellant.

Reversed.