## SCHLEIER v. UNITED STATES.
### No. 476.

Circuit Court of Appeals, Second Circuit.
Aug. 7, 1934.

MANTON, Circuit Judge, dissenting.

———————♦———————

Irving Spieler, of New York City, for appellant.

Martin Conboy, U. S. Atty., and Seymour Miller Klein and Francis A. Mahony, Asst. U. S. Attys., all of New York City, for the United States.

Before MANTON, SWAN, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

The 1934 February afternoon grand jury investigated the circumstances concerning the bankruptcy of a partnership known as Weinstein & Sons. Jacob, Max, and Samuel Weinstein, three partners in this firm, had been indicted on October 16, 1933, for the concealment and conspiracy to conceal from the receiver in bankruptcy about $50,000 worth of the assets of the firm. A superseding indictment was found against them by the 1934 February afternoon grand jury which then proceeded to try to determine who else, if any one, was implicated with the Weinsteins. The day following the return of the superseding indictment, to which the Weinsteins subsequently pleaded guilty, the appellant was called before the grand jury and interrogated.

It was known that a short time after Weinstein & Sons were adjudicated bankrupt a corporation known as the Beacon Coat Company had been organized, and that the three named former partners in Weinstein & Sons were in charge of this new corporation. It was conducting a business similar to that of the old partnership and had most of the former employees of the partnership in its employ. It was also known that the appellant, about the time the Beacon Coat Company was organized, had deposited $10,000 in cash in a bank in which he had a checking account and had at the same time drawn a check for that amount which he had certified and then exchanged for a certificate for 100 shares of Beacon Coat Company stock. Three or four days later the appellant had indorsed this certificate in blank.

The appellant is 39 years old and owns a delicatessen business in Newark, N. J. He has been in the business about fifteen years, and before that owned and sold two stores there. He had savings bank accounts of over $10,000 and a checking account which at times showed balances around $7,000, and had loaned money, made investments in mortgages, in building and loan associations, and owned the house in which he lived. His net worth was approximately $20,000.

He was acquainted with the Weinsteins, but knew practically nothing about the kind of business the Beacon Coat Company was to do. He could not remember its address, and, when he testified, had only been there once or twice and then merely by chance. He had never received monthly statements, never examined its books, and never had any dividends or returns of any kind on his supposed investment in its stock.

He testified that he had had $10,000 in a vault for some time in addition to his bank accounts, and that he was keeping this money secret from every one including his wife. He received a telephone call one day from

Charles Weinstein, who asked him to invest $10,000 in a new corporation, and was persuaded to make the investment by Charles, who called on him a few days later, although he knew that the Weinsteins had but recently become bankrupt in the same kind of business and that they were to conduct the business of the new corporation. He paid for the stock with the certified check. It was dated February 9, 1933. He was accustomed to consult his attorney before making investments, and said that, previous to his purchase of the stock, he had his attorney look into the matter and received a favorable report from him. The indorsement of his stock certificate in blank was made, he said, a few days after he bought the stock because a friend told him he was foolish to invest so much money in that business, and, becoming alarmed, he telephoned to ask Charles Weinstein to return his money. Charles promised to try to sell the stock and asked him to indorse the certificate in blank, but no sale was made and apparently the appellant made no further effort to dispose of the stock.

The district attorney in charge of the investigation was plainly unwilling to believe that the appellant, who by careful frugality had saved what money he had accumulated, would be likely to invest about half his net worth in such an enterprise and that his story of taking $10,000 from hiding to make it was untrue. He therefore pressed the appellant to tell where he kept the money before he put it in the bank, how long he had had it, and how he had accumulated it.

He first testified before the grand jury on February 14th. He was sworn and informed that he need not answer any question "if you feel that the answer to that question would tend to incriminate you." At no time, however, did he claim any privilege on that ground. At no time, also, did he do more than indulge in vague generalities about his accumulation and custody of the money. Some of his testimony was as follows:

"Q. Now, did you deposit the money in the bank? Was it in thousand-dollar bills or hundred-dollar bills or less? A. It was thousand-dollar bills and hundred-dollar bills.

"Q. How many thousand-dollar bills did you have? A. I can't remember.

"Q. Was it more than five? A. I can't remember exactly.

"Juror: Don't you know how many thousand-dollar bills you carried around with you? A. Well, yes, but I can't remember that. * * *

"Q. How long had it taken you to accumulate the $10,000 in the vault? A. I didn't accumulate in the vault.

"Q. How did the money get into the vault? A. I put it in.

"Q. When? A. I can't remember. * * *

"Q. How many times in your life have you put $10,000 into a vault? A. One time. * * *

"Q. Can't you tell us approximately when you put the $10,000 into that vault, which is the only time in your life you ever put $10,000 in a vault? A. I can't remember. I got the vault about two years and I can't tell exactly.

"Q. You must have put it in within two years prior to that date? A. Must be something like that.

"Juror: Did you get that vault especially to put the money in? A. Maybe I did. I got different papers—

"Q. Then you put the money in the same day you took out the vault? A. I don't think so.

"Q. After you took out the vault? A. Maybe a week or two, half a year, I can't remember.

"Q. Did you put the whole $10,000 into the vault at one time? A. Maybe was short a little bit. * * *

"Q. Where did you have the money? A. I kept it myself.

"Q. Where? A. At home, the store, in the pocket sometimes.

"Q. * * * When you kept it in your store, where in your store did you keep it? A. Maybe in a box or something like that.

"Q. Not maybe; where did you keep it? A. I had a good place, no one should know.

"Q. Where did you keep it? A. I can't remember, I can't describe it.

"Juror: Did you have a strong box in your store? A. I had a tin box for that purpose.

"Q. At the same time you were keeping this money in a tin box, you had several bank accounts, didn't you? A. Yes. * * *

"Q. What was the reason you kept this money in a tin box, whereas you kept other money in your savings account and other money in your checking account? A. Because I didn't want no one to know my business. * * *

"Juror: Can't you remember where you got $10,000? A. Exactly I couldn't tell where. I sold a business, maybe I kept it.

"Q. When did you sell your last business? A. 15 or 16 years ago.

"Q. You kept the $10,000 15 or 16 years? A. Maybe not exactly there.

"Q. Then you did not get it from your last business sale? A. No.

"Q. Where did you get it? A. (No answer) * * *

"Q. Did you have any fire insurance on your store during this period when you kept the money there? A. I always had insurance in my business. * * *

"Q. What was the highest it ever was? A. Never was higher or lower than $3000. * * *

"Q. When you kept the money at home, where did you keep it? A. Very seldom I kept it home because my wife is always home and I didn't want her to know.

"Q. When you kept it at home when your wife wasn't there where did you keep it? A. Maybe in a shoe, you never can tell."

After the witness had testified further in similar vein, the examination was suspended. On February 19th he appeared with his attorney before a District Judge on a presentment for contempt of the grand jury. His testimony given February 14th was introduced and considered, and he was directed to go before the grand jury and answer truthfully without trifling or suffer the consequences. His attorney then said to the judge: "We are not here to argue the point. We will do what you are telling us to do."

On the same day he testified before the grand jury again, but could remember nothing very definite about the money. He insisted that he had earned and saved it, but could not remember when or how. He just had it and kept it hidden in one place or another until he put it in the bank the day he drew a check for the Beacon Coat Company stock.

On March 1st he appeared before the grand jury again and testified at length. He denied that any of the money came from gifts to him or from money he borrowed and did not think any of it was from the repayment of loans he had made, but "maybe it was," for he could not remember.

A part of his testimony was:

"Q. Now, if maybe the money came from loans and maybe it didn't, and maybe it came from the sale of your businesses and maybe it didn't, and if it didn't come from gifts, where under the sun did it come from? A. I am in business, I accumulate $10,000.

"Juror: From where? A. I didn't steal it nowhere.

"Q. Now, where else besides the store did you keep the money? A. Only in the store.

"Q. Didn't you keep it at home? A. Maybe I took it up once.

"Q. Why did you take it home? A. Maybe I wanted to take a look at it and count it over.

"Q. Where did you keep it when you took it home? A. I had it where I was sleeping.

"Q. Under the mattress? A. Maybe under the pillow.

"Q. Did you keep it any other place? A. No.

"Q. You wanted to keep that money secret from your wife? A. Yes.

"Q. Where does your wife sleep? A. Maybe she was that time in the country.

"Q. Who is in your store now while you are here? A. My wife.

"Q. What does she do in the store wait on customers? A. That is all."

No additional information about the money was obtained from the witness, and he was, on March 2, 1934, again taken before the same District Judge who had previously directed him to disclose the truth about the money. He was represented by the same attorney and an additional lawyer. The matter was presented to the judge. When the record of the appellant's testimony was introduced and counsel had been heard, the judge indicated that the best solution would be for the appellant to decide to testify frankly. After arrangements had been made to enable appellant's counsel to have a copy of his testimony, an adjournment was taken to March 7th.

At the opening of the hearing March 7th, it appeared that counsel for the appellant had been furnished copies of all his testimony before the grand jury and had read it. They were given an opportunity to call any witnesses they desired, but none were called. After counsel had been fully heard in argument, the judge announced: "I will find that this was a proceeding pending before the Grand Jury, and that this man Louis Schleier is guilty of obstructing the administration of justice, namely, the investigation by this grand jury now in session, in giving false and evasive testimony and in giving ridiculous answers. I hold him in contempt and sentence him to three months."

The statute under which the appellant was adjudged in contempt and sentenced is

section 725, Rev. St., Jud. Code § 268 (28 USCA § 385). For its scope, effect, and the requisite procedure, see United States v. Mc-Govern (C. C. A.) 60 F.(2d) 880; Lang v. United States (C. C. A.) 55 F.(2d) 922; O'Connell v. United States (C. C. A.) 40 F. (2d) 201; Loubriel v. United States (C. C. A.) 9 F.(2d) 807.

When this appellant testified that he invested about half his savings in a new and unknown business which was to be in charge of men he knew were themselves bankrupt and knew had become so conducting a similar business, he told a most improbable story. If he did make a bona fide investment of his own money, it was at best a financially foolish thing for him to do. He was not a man who would be likely to do such a thing, and the grand jury was entitled to investigate the matter fully. It would have been derelict in its own duty had it accepted his bare assertion despite all its inherent improbability that he had taken a secret fund of his own with which to buy stock of extremely doubtful value at par. To let that pass untested by inquiry would make such an investigation no more than a farce.

If the testimony of the appellant given at the several times he appeared before the grand jury shows beyond a reasonable doubt that he obstructed the investigation by deliberate evasion and misleading answers, he was lawfully adjudged to be in contempt, and we are not called upon to deal with any of the variants of the principles set forth in the causes above cited. When his testimony is considered in connection with the known and undisputed circumstances, it is self-evident that the appellant did deliberately try to thwart the purpose of the investigation. He was mentally nimble enough to dodge the issue, but no reasonable man could believe that, if that $10,000 was his own money, he could not have told with a fair degree of certainty how he got it. By doing so he would have enabled the grand jury to have closed that phase of its work. By not disclosing what he knew, he made the situation more baffling. That he was hiding it from his wife with no apparent purpose seems merely a silly explanation of what he said he did. She helped him in his business when he was away, at least, and there was absolutely nothing to show that he lacked confidence in her. All things considered, we are satisfied that the judge could reasonably have reached no other conclusion than that beyond a reasonable doubt the appellant had persistently obstructed the administration of justice during his several examinations before the grand jury. Blim v. United States (C. C. A.) 68 F.(2d) 484, is not contrary to the conclusion we have reached. There the appellant had given a clear straightforward version of what he had done with certain money he had received. His conduct had been somewhat unusual perhaps, but it was not inherently improbable.

Affirmed.

MANTON, Circuit Judge, dissents without opinion.