## In re MECKLEY.

District Court, M. D. Pennsylvania.

May 26, 1943.

Frederick V. Follmer, U. S. Atty., of Scranton, Pa., and M. H. Goldschein and M. Reynolds Sands, Sp. Assts. to the Atty. Gen., for the Government.

Samuel Handler and Earl Handler, both of Harrisburg, Pa., for I. Walter Meckley.

WATSON, District Judge.

In a presentment by the Grand Jury, I. Walter Meckley (hereinafter called the Defendant) was charged with having obstructed the administration of justice by giving obstructive, perjurious, evasive, and contumacious answers to questions propounded to him while he was being examined before the Grand Jury. A full hearing was had on the merits and a brief was submitted by the Defendant.

The Defendant denies the charges contained in the presentment and interposed as a further defense that the Grand Jury is improperly constituted, and that the subpoena served upon him was not properly issued.

The contention of the Defendant that the Grand Jury is improperly constituted arises from the fact that two of the original grand jurors were excused and two other jurors were selected and empaneled in their stead after the Defendant had given some of the answers complained of. The record shows that these substitute jurors were selected and summoned in the manner in which all other jurors are selected and summoned in this District. This action was taken in strict compliance with the provisions of 28 U.S. C.A. § 421. The Defendant refers to the fact that there were originally only seventeen grand jurors and that, excluding the two substitute jurors, there would now be less than the sixteen jurors required by the provisions of 28 U.S.C.A. § 419. I cannot see how such a fact is at all material. Congress has, by statute, fixed the number of grand jurors necessary to constitute a legal grand jury and has also, by statute, established a method of sub-

stituting grand jurors. There is nothing to indicate that, in computing the number of grand jurors necessary to constitute a legal grand jury, the substituted grand jurors may not be included. The Grand Jury, as now constituted, was empaneled in accordance with the direction of the clear and unambiguous language of the statutes and is proper.

The Defendant also contends that he cannot be held in contempt because the subpoena served upon him did not contain information relative to either the names of the persons about whom he was to testify or the subject matter of the investigation. It might be sufficient to point out that the Defendant did appear and did testify and, consequently, has waived any objection which he may have had as to the legality of the subpoena. However, I find no merit in this contention for reasons which are well stated by Judge Augustus N. Hand in the case of In re Black, 2 Cir., 47 F.2d 542.

The evidence received at the hearing on the presentment consists of the transcript of the testimony of the Defendant taken before the Grand Jury and certain oral testimony of witnesses for the Government as to certain of the alleged perjurious answers. I have completely disregarded the oral testimony and the charge of the presentment relative thereto because I do not believe that this testimony shows beyond a reasonable doubt that this witness did give the perjurious answers as to which the oral testimony was offered. Therefore, the conclusion that I have reached and the following discussion are based solely upon the testimony of the Defendant before the Grand Jury.

The investigation being conducted by the Grand Jury relates to certain suspected irregularities in the construction of the Naval Supply Depot at Mechanicsburg, Pennsylvania. One of the matters under investigation is the manner in which bids for materials were obtained and accepted. To this end, inquiry was made of the Defendant, who supplied slag to one of the contractors, as to the manner in which he conducted his business, his relations with certain other persons who were engaged in the work of constructing the Depot, and the disposition he made of the profits received from his business. That the matters about which he was interrogated are material to the investigation is obvious, and his wilful refusal to divulge the information delayed and hampered the investigation of the Grand Jury and obstructed the administration of justice.

I have examined with great care the transcript of the testimony of the Defendant taken before the Grand Jury, and I find that it shows a clear and open wilful disregard for the authority of this Court. The various conflicting and obviously false answers of the Defendant to questions asked him leave no room for doubt that this Defendant intended to and actually did prevent the Grand Jury from obtaining information which was desired. The Defendant's frequent repetition of the phrase "I don't remember" as to matters which he quite obviously could not have forgotten, and his frequent reference to documents and memoranda not at hand without which he stated he could not testify and give the information requested, and his inability to supply the required information when these documents and memoranda were available to him, show beyond question the contumacy of this witness and his desire to obstruct the examination by asserting the first excuse or answer which came to mind.

It would be impracticable to set forth here sufficient portions of the testimony to show the extent of the Defendant's utter disregard for the authority of this Court. I am not particularly concerned with the obvious falsity of the Defendant's testimony as such. What does concern the Court is that this Defendant by testifying falsely, and by utilizing other means of concealing the true facts, has obstructed and delayed the investigation. It is, from the point of view of this proceeding, immaterial whether or not his testimony that he did not pay money to certain named individuals is true or false. What is material is, whether or not the profits from the enterprise operated by the Defendant was used in connection with an agreement or conspiracy on the part of the named individuals, or other persons, to defraud the United States. To ascertain that matter, it is necessary for the Grand Jury to learn how he disposed of his profits and how his slag business was conducted and for whom. Had the Defendant testified truthfully, willingly, and as clearly as possible, the Grand Jury would now be in a position to proceed with lines of inquiry indicated by the Defendant's testimony or, perhaps, would find that there was no need to investigate further. However, the De-

fendant did not so testify and, as a result, certain of his answers must be checked by investigators and certain information as to which the Defendant alone can testify must remain unavailable to the Grand Jury unless and until the Defendant decides to reveal it. The examination of the transcript of the testimony of the Defendant shows that, from the standpoint of the value of the information obtained by the Grand Jury, the answers and statements made by him are substantially equivalent to a refusal to testify and their effect is even more obstructive to the investigation than such refusal would have been.

I shall refer here to only a few instances of contumacy of the Defendant which are particularly pertinent to the inquiry of the Grand Jury.

The Defendant testified that he sold a truck for use at the Depot in January or February of 1942 for $1,000, which sum was paid in cash, but, when questioned about it in January of 1943, he was unable to recall what he did with the money except that he "carried it around a while". When asked whether he usually knew where he spent his money, he stated "Some I do, some I don't want to know."

The testimony also reveals that the Defendant drew checks payable to himself or cash upon his checking accounts in the total sum of $68,125.48 during the period from May 16, 1942 to November 25, 1942. Only two of these checks were in an amount less than $5,000. When examined on January 13, 1943 as to the disposition of this money, he was unable to recall what he had done with it, and stated it would be necessary to consult with his bookkeeper and to look at certain unidentified memoranda. He was again examined as to these withdrawals in April and May of 1943 after consultation with his bookkeeper and with his memoranda at hand. Even with this assistance, the Defendant was unable to state what was done with almost half of the withdrawals. For example, on May 22, 1942 the Defendant cashed two checks each in the sum of $5,000. Upon being questioned as to what was done with this money, he stated that he "may" have taken some of it to the races and he "may" have put some of it in his safe deposit box in a bank, but he does not remember. He also testified that he placed in the safe deposit box the proceeds of a check for $5,000 drawn May 26, 1942 and a check for $10,000 drawn July 11, 1942. However, in each instance he had no clear recollection of what he did with this money, and testified that he carried in his pocket as much as $10,000 during this period without the slightest recollection of what he did with it. When asked as to why he withdrew money from his account and placed it in the box, his only answer was "I do those things." And it is worthy of note that the Defendant is only fifty-nine years old and a successful business man. In addition, the Defendant testified that he had not made withdrawals of this size from 1932 to the period in question.

The Defendant was examined as to the money which he states he took to the races, and he testified that he lost as high as six or seven thousand dollars in one day by betting on the results of the horse racing, but was unable to give the name of the track at which he lost the money or the name of a single horse upon which he bet. He also testified that he lost as much as $1,000, and, at other points in the testimony, $2,000 in one race, but is not sure of the name of the track, the date on which he lost this money, and does not have the slightest recollection of the name of the horse or horses upon which he placed this bet. Nor is the Defendant's purported lack of memory confined to losses because he is equally forgetful as to the amount of moneys he won, the place, and the names of the horses which apparently infrequently justified his judgment. In fact, when questioned as to certain income received in 1943 and after a protracted examination he testified that he won $2,000, and, upon being asked why he had not so testified before, replied, "I didn't want to say anything about it."

The Defendant also testified that he removed $13,000 worth of bonds from his safe deposit box on April 30, 1943 but, on May 3, 1943, he had forgotten what he had done with them and extended examination elicited only the information that they must have been mislaid. On May 5, 1943, the Defendant produced the bonds with the explanation that they had been located at Wildwood, New Jersey, and that "I left them there (Wildwood, New Jersey) so I wouldn't lose them, then I forgot to bring them along." At the same time, however, the safe deposit box contained $10,000 in cash which, apparently, did not require the added security of being transported to Wildwood, New Jersey.

Lest it appear that the Court has been misled, I wish to state that I find in the

record testimony and reference to evidence that the Defendant now has cash or property in the sum of approximately $60,000, and has repaid a loan of $5,500, and, in this way, seeks to account in part for the ultimate disposition of the withdrawals. However, at least $20,000 of this amount consists of bonds purchased since January 1, 1943 and cash found in the Defendant's safe deposit box, which cash represents, largely, income not connected with Defendant's withdrawals from May to November of 1942. Hence, it can hardly be deemed an explanation of the immediate disposition of money withdrawn from May to November of 1942. In fact, the vague and conflicting testimony of the Defendant makes it impossible to ascertain whether the money which is not accounted for even in this way is $12,000 or twice that amount. And it is this unascertainable sum which the Defendant would have the Grand Jury and the Court believe was lost at the races at times, places, and upon horses which the Defendant, less than one year later, was unable to recall.

Even the testimony of the Defendant regarding the manner in which he severed his connection with the slag business is so remarkable and told with such reluctance that it cannot be believed. According to the Defendant after a protracted examination in January, April, and May of 1943, he became tired of supervising an operation consisting of removing slag from a slag pile and transporting it from Lebanon and Cornwall, Pennsylvania to the Depot at Mechanicsburg, Pennsylvania, and, in August of 1942, turned the business over to a very good friend named Forney. The fact that Forney owed him $8,000 is also related as a motivating factor. Accordingly, this business from which the Defendant had received a net profit of approximately $79,000 in a period of about eight months was turned over to Forney without any consideration therefor other than that related above. In addition, the Defendant loaned Forney $29,500 with which to operate the business without obtaining a note or other evidence of this indebtedness or security for its repayment. The Defendant further testified that, after giving the slag business to Forney he continued to operate the business in Forney's behalf without receiving any compensation for sustaining the heavy burden of the work and that, although Forney repaid the loan of $29,500, the Defendant has not yet received payment of the debt of $8,000 because, as he says "I haven't asked him for it."

That the members of the Grand Jury became exasperated after listening to the testimony of the Defendant for what appears to have been almost a full day is quite understandable, and I find no justification for the contention of counsel that the Grand Jury was prejudiced. At the close of the Defendant's testimony on January 13, 1943, appear the first remarks of the jurors concerning this witness and then only after they had listened to a recital of a number of incredible events and transactions, a number of instances of evasive responses and responses clearly indicative of an intention to conceal the true facts, and a display of what can be considered only as a studied failure of memory. These jurors have devoted a great deal of their time and energy to this investigation and their honesty and integrity is above question. They had the advantage of observing this Defendant as he testified, and their appraisal of the character of this Defendant's testimony given without prompting from the representatives of the Department of Justice is a valuable factor which cannot be ignored, and cannot be brushed aside by the unsupported accusation of counsel that they were prejudiced against a witness in all probability unknown to them before his appearance on January 13, 1943.

The conduct of this Defendant is not unlike that found in the cases of Schleier v. United States, 2 Cir., 72 F.2d 414; and United States v. McGovern, 2 Cir., 60 F. 2d 880; and I find that Blim v. United States, 7 Cir., 68 F.2d 484, and Ex parte Hudgings, 249 U.S. 378, 39 S.Ct. 337, 63 L.Ed. 656, 11 A.L.R. 333, are not contrary to the conclusion I have reached that this Defendant is guilty of contempt.

Now, May 26, 1943, I find and adjudge I. Walter Meckley guilty of contempt of this Court, and the rule granted May 7, 1943 is hereby made absolute.