Theodore COLLINS, Appellant,

v.

UNITED STATES of America, Appellee.

No. 16379.

United States Court of Appeals Ninth Circuit.

Aug. 7, 1959.

Jeffrey M. Bucher, Henry W. Low, Los Angeles, Cal., Manuel L. Real, San Pedro, Cal., for appellant.

Laughlin E. Waters, U. S. Atty., Max H. Goldschein, Philip T. White, Asst. U. S. Attys., Los Angeles, Cal., for appellee.

Before BARNES, HAMLEY and JERTBERG, Circuit Judges.

JERTBERG, Circuit Judge.

This is an appeal from a conviction of criminal contempt. Appellant was convicted under Section 401 of Title 18 U.S.C., on the basis of his testimony before a United States grand jury, and sentenced to custody for a period of three years.

The grand jury investigation, from which appellant's conviction arose, was an attempt to determine whether the murder of Cecil (Hardrock) Thomas on October 27, 1957 was committed to prevent him from testifying in the Federal District Court in Los Angeles, California, on the date he had been subpoenaed to appear in a case in which the defendants therein had been charged with sales of heroin.

Appellant was brought before the grand jury from the California State Prison at San Quentin, California, where he is serving a life sentence imposed after he confessed killing Thomas in the course of a burglary and pleaded guilty to murder in the first degree.

A proper review of this appeal requires that we summarize the appellant's testimony before the grand jury. During the course of the first day of his testimony, April 16, 1958, appellant related three wholly different and inconsistent accounts of the events concerning Thomas'

killing. Appellant first told the grand jury that while he was in the process of burglarizing Thomas' home, Thomas entered the house. Appellant warned Thomas not to move and when Thomas jumped toward appellant, appellant shot him and ran.

Under examination appellant related that he had given a different account of the killing to the government investigators that same morning before the grand jury proceedings had started. In that account, which appellant repeated to the jurors, he stated he had gone to Thomas' house at the request of Thomas, because Thomas was afraid and wanted appellant to stay with him in return for "half a piece" of heroin. Shortly after he arrived Thomas asked him to check a noise at the back of the house, which he did. Appellant said that as he stepped out the back doorway someone twisted his neck, frisked him and took his gun. Another man took him from the rear of the house to a car parked in front, and after he heard two shots one of the men came running from the house, got in the car and they all drove off. When appellant was asked which version was true, he answered that he actually shot Thomas but that it was not in the course of a burglary.

Appellant then gave a third account of the killing. This time he told the jury Thomas had been putting him off in paying back some money appellant had loaned Thomas and he had gone to Thomas' house to settle it. Appellant said he told Thomas he had to have the money "or stuff", meaning heroin. Whereupon Thomas went into his bedroom and came back with a 30-30 rifle and told appellant to leave the home. At this point appellant was reminded that Thomas had been found dead on the floor, with a clothes brush in one hand and some trousers and a hanger on top of him. This led to other related questions and appellant never finished his third version of the killing. Appellant explained that he hadn't told the police about the narcotics because when he was in the county jail other inmates advised him the authorities would be more severe on him if he mentioned narcotics rather than burglary. He then testified that all the details concerning the burglary were not true. After further questioning concerning where he had obtained the $250 to loan Thomas and concerning his sources of narcotics, he was asked if he had told anyone else the story about Thomas being killed by the three men. Appellant said he had told the story to someone in the county jail, but he couldn't remember who, other than that he was in the same tank with him. When asked why he told him the story, appellant answered that it was because "actually that story is true". He then repeated the "three men story" with greater detail, adding that after the three men had driven him away, they gave him $1,000, told him it would be best for him to leave town, and that if he opened his mouth something would happen to his family, with the implication it would happen to his two children. Then, he said, they threw the gun at him and dropped him off. He testified that he was still afraid for his family.

Appellant was not called by the grand jury to testify again until over a month later, on May 23, 1958. He then repeated the three-man story as the truth, giving essentially the same details as he had in April except that this time he stated he had received $500 instead of $1,000 to keep quiet about Thomas' killing. He was not then questioned about the discrepancy, and the remainder of his testimony on that day consisted of questioning concerning events before the killing, his sources of narcotics, and Thomas' reputation as an informer.

Appellant was next called on July 14, 1958, and the transcript of his testimony of May 23, 1958 was read to him. He was further questioned about his sources and knowledge of narcotics. When asked why he told the grand jury the burglary story he replied that as far as he was concerned it was the true story; it was what he was tried and convicted of, murder and burglary. He was then asked, "You mean that is what really happened?" To which he replied, "No, that is not what

I said. I have told you what really happened." By that he meant that the "three-man story" was a description of what "really happened". Staying with the three-man story he was however unable to remember whether the payoff for keeping quiet was $1,000 as he had stated on April 16th, or $500, or that he had previously given the grand jury any exact amount. In fact, during the testimony given on July 14th he had a hard time remembering anything, complaining at one time that he had "a bad—lack of memory that's been giving me trouble. I have a hard time remembering things, you know."

Appellant appeared before the grand jury again on July 25, 1958, and again repeated the "three-man story". Although he expressed the fear that by being brought back and forth from the penitentiary he would get a "jacket", which he described as "an informer's jacket. You get a jacket on you, that you are informing, maybe pretty soon you get a knife stuck in your back while walking in the yard or something like. I don't want nothing like that to happen." As to the details of the story, this time he thought he had received $1,000 from the three men. Otherwise he told essentially the same details he had told before concerning the "three-man story".

After the July 25th session, appellant was not called by the grand jury again, and the presentment charging appellant with contempt was filed on September 9, 1958.

Specified as further evidence of appellant's attempt to thwart and obstruct the purposes of the grand jury, the presentment referred to other conflicts in appellant's testimony:

1. As to how long he had known Thomas, appellant told the grand jury on April 16, 1958 that he had known Thomas three or four months; then later the same day, four or five months; on May 23, 1958, three or four years; and on July 25, 1958, at first he couldn't remember how long but later said approximately four years.

2. As to how appellant came to know Thomas, appellant testified on April 16th that it was through a friend whom he designated by a nickname, but on July 14, 1958 he couldn't remember so testifying, although he did say if he had told the grand jury who introduced him to Thomas the statement was true.

3. As to his being at Thomas' house before the killing, appellant on April 16th told the grand jury that he had been in Thomas' house once—"when I shot him." But on July 25th when asked if he had ever gone to Thomas' home before, appellant answered "I think once before, I am not sure," and finally agreed he had been there once before.

4. As to his use of narcotics, appellant in answer to the same question, "How big a habit do you have?" said on April 16th, "Oh, I would say about two spoons a day." And on July 14th, "Well, a spoon would last me a month." On April 16th he stated the two spoons per day cost him "$40 or $50" a day, but on July 25th he denied having made any such statement, adding that a spoon of heroin cost him $25 and "would last me quite sometime."

5. As to what he meant by "a half a piece of stuff", appellant testified on April 16th that it was an ounce "more or less" of heroin, but on July 14th he said he didn't know, "I never measured it," although he admitted at the same time that he had bought six or seven spoons at one time from one peddler alone.

6. As to the persons from whom appellant bought narcotics, he testified on April 16th that he had not bought any from the person who introduced him to Thomas, but after he was granted immunity under the Narcotics Control Act of 1956, 18 U.S.C. § 1406, and ordered to answer, he testified that he had purchased narcotics from such person, as well as from four others, whom he named.

7. As to the car which the three men used when they took appellant from Thomas' home, appellant testified on April 16th that it was a 1956 or 1957

Ford, but on July 25th he could only remember that it was a medium four-door car.

The government's case consists of only those portions of the transcript of the grand jury proceedings in which appellant's testimony was transcribed. His testimony covered 191 pages. The transcript at the time of the contempt hearing consisted of 2592 pages, and at which time the investigation was still continuing.

As the only other part of its case the government called the foreman of the grand jury, who merely testified for the purpose of establishing the jurisdiction of the court, giving the subject of the investigation and that he had read the presentment and to his best information and belief the matters set forth in it were true. The presentment itself was, however, not admitted as evidence, but used only for purposes of background.

On the basis of this evidence the district court found appellant guilty of criminal contempt under the following provisions of 18 U.S.C. § 401:

"A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt and none other, as—

"(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice; * * *"

On this appeal we are presented with the single question of whether there was sufficient evidence to sustain the district court's finding that appellant's testimony constituted criminal contempt by obstructing the administration of justice.

That the evidence shows that at least some of appellant's testimony was false and perjurious is, of course, obvious. Not all of his inconsistent accounts of Thomas' killing and surrounding details can be true. But perjury alone, as the goverment concedes, is not sufficient to give the court the power to punish for contempt. This power can only be exercised when the court finds that, in addition to the perjury or whatever other

misbehavior there might be, there is present also the further element of obstruction to the administration of justice. Ex parte Hudgings, 1919, 249 U.S. 378, 383, 39 S.Ct. 337, 63 L.Ed. 656; and as reaffirmed in the case of In re Michael, 1945, 326 U.S. 224, at pages 227–228, 66 S.Ct. 78, at page 80, 90 L.Ed. 30:

"All perjured relevant testimony is at war with justice, since it may produce a judgment not resting on truth. Therefore it cannot be denied that it tends to defeat the sole ultimate objective of a trial. It need not necessarily, however, obstruct or halt the judicial process. For the function of trial is to sift the truth from a mass of contradictory evidence, and to do so the fact finding tribunal must hear both truthful and false witnesses. It is in this sense, doubtless, that this Court spoke when it decided that perjury alone does not constitute an 'obstruction' which justifies exertion of the contempt power and that there 'must be added to the essential elements of perjury under the general law the further element of obstruction to the Court in the performance of its duty.' Ex Parte Hudgings, supra [249 U.S.] 382, 383, 384 [39 S.Ct. 339, 340]. And the Court added, 'the presence of that element [obstruction] must clearly be shown in every case where the power to punish for contempt is exerted.' * * * Of course the mere fact that false swearing is an incident to the obstruction charged does not immunize the culprit from contempt proceedings."

As an example the court cited Clark v. United States, 1937, 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993, where the false statement by a prospective juror that she was not employed by the defendant was made in order to qualify for the jury. In such a situation the effect of such a false statement is of course self-apparent and so obvious and flagrant as to place the "doom of mere sterility * * * on the trial from the begining," supra at page 11 of

289 U.S., at page 468 of 53 S.Ct.; clearly an obstruction of justice punishable by contempt.

▮ It is also true that the power to punish for contempt can arise where from the testimony itself it is apparent that there is a refusal to give information which in the nature of things the witness should know. In such cases the obstruction is less apparent than the contempt punished in the Clark case, and the test is not whether the testimony was perjurious or false but whether without the aid of extrinsic evidence the testimony is "so plainly inconsistent, so manifestly contradictory, and so conspicuously unbelievable as to make it apparent from the face of the record itself that the witness has deliberately concealed the truth and has given answers which are replies in form only and which, in substance, are as useless as a complete refusal to answer." Finkel v. McCook, 1936, 247 App.Div. 57, 286 N.Y.S. 755, 761. Or as Judge Learned Hand stated in United States v. Appel, 1913, D.C.N.Y., 211 F. 495, 496, cited with approval in Ex parte Hudgings, and specifically distinguished in the In re Michael case:

> "The rule, I think, ought to be this: If the witness' conduct shows beyond any doubt whatever that he is refusing to tell what he knows, he is in contempt of court. That conduct is, of course, beyond question when he flatly refuses to answer, but it may appear in other ways. A court, like any one else who is in earnest, ought not to be put off by transparent sham, and the mere fact that the witness gives some answer cannot be an absolute test. For instance, it could not be enough for a witness to say that he did not remember where he had slept the night before, if he was sane and sober, or that he could not tell whether he had

been married more than a week. If a court is to have any power at all to compel an answer, it must surely have power to compel an answer which is not given to fob off inquiry. Nevertheless, this power must not be used to punish perjury, and the only proper test is whether on its mere face, and without inquiry collaterally, the testimony is not a bona fide effort to answer the questions at all."

▮ The use of such a test is well founded. It is based on the concept that the power to punish for contempt is an inroad "on the procedural safeguards of the Bill of Rights, since contempts are summary in their nature, and leave determination of guilt to a judge rather than a jury." In re Michael, supra, 326 U.S. 227, 66 S.Ct. 80. See also Cammer v. United States, 1956, 350 U.S. 399, 403–404, 76 S.Ct. 456, 100 L.Ed. 474; Nye v. United States, 1941, 313 U.S. 33, 50–53, 61 S.Ct. 810, 85 L.Ed. 1172. Cf. Brown v. United States, 1958, 356 U.S. 148, 153, 78 S.Ct. 622, 2 L.Ed.2d 589; Green v. United States, 1958, 356 U.S. 165, 172–173, 78 S.Ct. 632, 2 L.Ed.2d 672. The clear teaching of these cases is that "the grant of summary contempt power, contained in 18 U.S.C. § 401 is to be grudgingly construed, so that the instances where there is no right to a jury trial will be narrowly restricted to the bedrock cases where concession of this drastic power to the courts is necessary to enable them to preserve their authority and to insure the maintenance of order and decorum in the proceedings before them." Farese v. United States, 1 Cir., 1954, 209 F.2d 312, 315.

The federal cases have generally followed this reasoning, punishing for contempt only when it is apparent from the testimony itself that the witness' behavior is substantially equivalent to a refusal to testify.[1] But where perjury

---

[1]. United States v. Appel, supra, 211 F. 496 (witness could not remember what he had done with money withdrawn five days before); O'Connell v. United States, 2 Cir., 1930, 40 F.2d 201, 205 (witness gave no information, answered only "I

don't remember" or claimed a privilege against self-incrimination); United States v. McGovern, 2 Cir., 1932, 60 F.2d 880, 889–890, affirming D.C.S.D.N.Y., 1 F.Supp. 568, 570 ("preposterous" and "unbelievable" answers to all questions

alone is shown without the added element of obstruction of justice the power has been withheld.[2] It is in this setting that we must consider the present case.

■ In this case, appellant, while represented by counsel, pleaded guilty to murder in the commission of a burglary knowing it was a capital offense,[3] which under the applicable state law carries with it a sentence of either "death, or confinement in the state prison for life, at the discretion of the court or jury * * *" Penal Code of California §§ 189, 190, 190.1. Then after being sentenced to life imprisonment, he returns to tell a grand jury first that he did commit the crime during a burglary, then that he didn't kill the victim but was only an innocent bystander while three other men did it, then that he had killed the victim all right but during an argument over a loan and narcotics but not during a burglary, and finally changes his story again, telling the grand jury that the three anonymous men were actually the ones who did the killing. Even if the appellant were in great fear of reprisal by the "three men" it is hardly conceivable that to escape them he would have pleaded guilty to a murder for which he might well have been sentenced to death, and if not, certainly to life imprisonment. A

court could properly conclude from such inconsistent testimony that it was so conspicuously unbelievable as to indicate a deliberate attempt to conceal the truth, amounting to a refusal to answer at all. True, appellant did give the grand jury information which might have proven valuable, but on the crucial issues of who killed Thomas and why the sum total of appellant's testimony is confusion, inconsistency, and contradiction. When such testimony is considered in the light of appellant's plea of guilty to a capital offense it stretches credulity to the breaking point and can only be characterized as unbelievable, preposterous and designed to mislead the grand jury and obstruct the administration of justice.

That appellant may have felt compelled to conceal the truth from the grand jury to protect himself and his family from the vengeance of the narcotics underworld is understandable, but such reason furnishes no defense. To permit otherwise would be to abandon our system of criminal investigation to the threats and intimidation of the unscrupulous who seek every advantage to block inquiry into their activities. The protection of society compels nothing less.

The judgment of the district court is affirmed.

concerning disposition of $380,000.00); Schleier v. United States, 2 Cir., 1934, 72 F.2d 414, 417 ("inherently improbable" explanation of source and disposition of $10,000.00); In re Meckley, 3 Cir., 1943, 137 F.2d 310, 311, affirming D.C.M.D.Pa., 50 F.Supp. 274, 275–277, certiorari denied 320 U.S. 760, 64 S.Ct. 69, 88 L.Ed. 453 (contradictory, unbelievable explanation of witness' disposition of funds and business dealings).

2. Ex parte Hudgings, supra, 249 U.S. 382, 384, 39 S.Ct. 339, 340 (perjury alone); In re Michael, supra, 326 U.S. 229, 66 S.Ct. 80 (perjury alone); United States ex rel. Johnson v. Goldstein, 7 Cir., 1947, 158 F.2d 916, 921 (perjury, no showing that court had been misled); In re Gottman, 2 Cir., 1941, 118 F.2d 425, 427 (witness gave false testimony, then recanted); United States v. Talbot, D.C. Alaska, 1955, 133 F.Supp. 120, 128, (al-

leged false testimony with admission by witness that testimony could be false); United States v. Arbuckle, D.C.D.C. 1943, 48 F.Supp. 537, 538 (perjury alone).

3. Before the grand jury appellant testified as follows:
"Q. I am talking about murder now. You knew that murder was a capital offense? A. Yes.
"Q. And what was the difference between a capital offense for killing a man over a burglary than narcotics, if it was a capital offense? A. I don't know too much about law.
"Q. But you knew enough to know it was a capital offense, didn't you? A. I knew it was a capital offense, burglary?
"Q. Murder was a capital offense. I didn't hear you. A. Did I know murder was a capital offense?
"Q. Yes. A. Yes, yes."