### In re Grand Jury Witness Chanie WEISS, Appellant.

### No. 1219, Docket 83–6026.

United States Court of Appeals, Second Circuit.

Argued Feb. 3, 1983.

Decided March 18, 1983.

Nathan Lewin, Washington, D.C. (Stephen L. Braga, Miller, Cassidy, Larroca & Lewin, Washington, D.C., Guy L. Heinemann, New York City, on brief), for appellant.

Ruth A. Nordenbrook, Asst. U.S. Atty., Brooklyn, N.Y. (Raymond J. Dearie, U.S. Atty., E.D.N.Y., Mary McGowan Davis, Asst. U.S. Atty., Brooklyn, N.Y., on brief), for United States of America.

Before FEINBERG, Chief Judge, and LUMBARD and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

Chanie Weiss appeals from an order of the United States District Court for the Eastern District of New York, Thomas C. Platt, *Judge*, adjudging her to be in contempt of court pursuant to 28 U.S.C. § 1826(a) (1976) for her refusal to give truthful and nonevasive answers to questions posed by a federal grand jury after being ordered to do so by the court, and ordering her imprisoned for so long as her refusal shall continue. Appellant challenges the contempt order principally on the grounds that (1) § 1826(a) authorizes a contempt adjudication only with respect to witnesses who completely refuse to answer and not witnesses whose answers are "arguably evasive," and (2) the government failed to prove by clear and convincing evidence that Weiss's answers constituted deliberate refusals to answer. For the reasons below, we conclude that the adjudication of civil contempt should be reversed on the latter ground.

## I. BACKGROUND

The present appeal arises in the context of an ongoing grand jury investigation into suspected fraud by various individuals in the conduct of an operation called "Project Joint," a project that obtained funds under the Comprehensive Employment Training Act ("CETA"), 29 U.S.C. §§ 801–999 (Supp. V 1981). The grand jury is inquiring into the possibility that Project Joint falsely claimed to have trained approximately 120 students between January 1977 and June 1978 when in fact it had trained none, and had obtained, by means of false documentation approximately one million dollars in federal moneys for the training of such nonexistent students. Weiss, the only person listed in Project Joint's books as a counselor from January 1977 through June 1978, was summoned to testify before the grand jury. On November 2, 1982, the district court signed an order granting her immunity from prosecution on the basis of her testimony. Weiss was not, however, immunized against prosecution for perjury, obstruction of justice, or any other crime stemming from untruthful testimony before the grand jury.

From the outset Weiss's testimony was less than enlightening. Weiss testified that she had worked for Project Joint, but when asked what kind of program Project Joint was, she stated, after conferring with her counsel outside the grand jury room, that since she was not an officer or administrator of the program she "really couldn't

speak for it."[1] (11/3/82 Tr. at 5.) Weiss stated that she could speak only in terms of what she did for Project Joint. Even this information, however, proved to be elusive. For example, although Weiss testified that she did "counseling," which involved "[j]ob placement if I remember correctly" (*id.* at 18), she stated that she did not remember the ages of the persons she counseled:

A ....

...[C]ounseling encompassed everything. It encompassed talking to students, it encompassed talking to parents, it encompassed finding placements. That is what I did.

Q And for students of what kind of institution?

A I really worked in—I would like to see my counsel.

(Witness exits Grand Jury room.)

(Witness enters Grand Jury room.)

THE FOREMAN: We have a quorum.

Q What is the answer to the last question?

A I understand it was a school.

Q For what age students?

A I would like to confer with my counsel, please.

(Witness exits Grand Jury room.)

....

(Witness enters Grand Jury room.)

Q Do you know the answer to the last question, Ms. Weiss?

A The best of my recollection, all ages.

Q Seven and eight year olds were students at Project Joint?

A You asked me how many people there were—what ages.

Q Correct.

A That were in a whole.

Q I asked at Project Joint that you were counseling.

A I am sorry. I misunderstood your question.

To my best recollection, I would remember adolescents.

Q You mean children between the ages of 14 and 18 years old?

A It would really be hard for me to remember. I really don't remember.

Q You do not recollect that Project Joint was for adults and, in fact, only received money to train adults?

A I worked with adults and I worked with children. I worked with adolescents, these that had—

Q At Project Joint you worked with adolescents?

A I counseled people.

Q You counseled adolescents who were enrolled as Project Joint, is that your testimony?

A I would like to meet with my counsel.

(Witness exits Grand Jury room.)

(Witness returns to Grand Jury room.)

Q What were the ages of your counselees at Project Joint?

A I have seen a lot of people in all the years that I have counseled, and truthfully, it is very hard for me to decipher exactly which years I saw whom and what.

Q So it is your testimony you do not recall the ages of your cou[n]selees at Project Joint; is that correct?

A Yeah....

(*Id.* at 14–17.) Nor could Weiss remember what she did to help the students find jobs:

Q How long was the school term or training term for enrollees at Project Joint?

A I don't remember.

Q What were your duties as a counselor?

A It's hard to remember specifically. Basically I saw people for many different reasons. They ranged from personal to placement—it's very hard for me to remember specifically what I did at that specific time.

Basically, I did counseling.

---

1. Because of the secrecy of grand jury proceedings, the record on this appeal has been sealed. To the extent that portions of the record are used in the present opinion they are deemed unsealed.

Q What did you counsel? You say placement, what did you do with the students with regard to placement?

A . . . .

There were all sorts of things. There were people looking for positions which I helped them find.

Q What kind of positions were they looking for?

A I don't remember specifically.

Q . . . .

Did that entail calling prospective employers on behalf of the students?

A I don't remember. This is the job in a nutshell, but I don't remember exactly what I did.

Q Did that entail taking information from students about what their curriculum had been?

A I don't remember.

Q Did that entail testing of any sort with regard to their proficiency in some vocation or craft?

A It might have, but I don't specifically remember.

2. Weiss testified that she also counseled people with respect to problems other than job placement, but she could not remember what they were:

> Q It's your testimony to this Grand Jury that you cannot remember any other places that you counseled Project Joint enrollees, save your office?
> A Yes.
> Q And you cannot remember counseling them with regard to any subject matter save job placement, is that what you're telling this Grand Jury?
> A No, I counseled people for many different things.
> Q What other things?
> A They ranged from personal problems—
> Q What kind of personal problems did you counsel them in?
> A All kinds of personal problems.
> Q You were being paid by Project Joint to counsel enrollees with regard to personal matters, is that correct?
> A Counseling to me—
> Q The question is, you were being paid by Project Joint to counsel enrollees with regard to personal matters, is that correct?
> A To counsel, in counseling, I have done—

Q Did you have a list of employers who might potentially employ the students of the Project Joint Program?

A I might have, I don't remember. (11/10/82 Tr. at 16–17.) [2]

Weiss also testified that she could not remember, *inter alia,* whether she had anyone working under her at Project Joint, whether there were other counselors, what size her office was, whether she shared that office with anyone else, or whether she kept any records of information obtained from her counselees. She did "not now" recognize the completed Project Joint forms shown her, and stated that she could not say whether any of the handwriting or printing in which information had been filled in was done by her.

Although Weiss testified, after conferring with counsel, that her job at Project Joint was a full time job "[t]o the best of [her] recollection," (11/3/82 Tr. at 33–34; *see also* 11/10/82 Tr. at 24), she could not recall what her hours were, what she was paid, whether she was paid by the hour, what the address of Project Joint was, what her own home address was at the time, or the period during which she held the job.[3]

> Q I'm asking you whether a part of your job description for which you were being paid at Project Joint out of public money was counseling enrollees with regard to their personal problems unrelated to their schooling?
> A I would say it would entail—look, I don't remember specifics. I would say as far as I am able to recall it it could have entailed—
> Q I'm not asking what it could have, did you counsel enrollees with regard to their personal problems while you were on the staff of Project Joint?
> A I don't remember, but it might have happened.
> Q What other things did you counsel them with regard to?
> A I don't remember.
> Q Besides job placement.
> A I don't remember.
> (11/10/82 Tr. at 25–26.)

3. Weiss gave the following testimony as to the time requirements of her job:

> Q You were a full time employee, is that correct?
> A Yes, I was. The best I recall I was there full time. If I remember correctly.
> Q That involved a 40 hour work week?
> A I don't remember.

She would not say unequivocally even whether at the time she worked for Project Joint she was also finishing her college education.

Weiss, who was 34 years old at the time she first testified, was asked whether she had ever been hospitalized for mental illness, whether surgery she had undergone had impaired her mental functioning, whether she had suffered any physical trauma that would have affected her memory, and whether she was currently taking any mood-altering medication. She responded in the negative to each question. Weiss attributed her lack of memory with respect to Project Joint to the facts that she had had two other jobs since working for Project Joint, had counseled a large number of people, and her memories had fused; that she had been ill in the interim and had had personal problems that occupied her mind; and that her job had not been memorable.

As some of the above transcript excerpts indicate, Weiss's testimony was profusely punctuated by her departures from the grand jury room to confer with her counsel. During her first appearance before the grand jury, for example, there was one forty-seven-minute period during which Weiss exited to confer with counsel seventeen times. The lengths of these conferences ranged from one to seven minutes.

> Q Well, if you worked less—what was your salary check, what salary did you get?
> A I don't remember.
> Q Well, if you worked less—you don't remember how long you were supposed to be there each day?
> A Not really, I held numerous jobs since then. It's difficult for me to remember exactly what my paychecks were in every particular position I held. I know I was definitely there nine o'clock in the morning. I know that I stayed many a time until 4:30, 4:00, 4:30. If anybody needed counseling, I would stay later.
> I don't remember exactly what my specific hours were, whether from 9:00 to 3:00 or 9:00 to 4:00 or 9:00 to 4:30. It's difficult for me to remember that.
> Q Suppose you didn't come into work one day, were you paid for that day?
> A I don't remember, but I assume I had sick leave. I don't remember.

During this forty-seven minute stretch only thirty-one questions were put to Weiss.

Weiss appeared before the grand jury four times. On November 24, 1982, after the third appearance, the government moved pursuant to 28 U.S.C. § 1826(a) to have Weiss, along with one Rivka Feder, another witness called to testify with respect to Project Joint, held in civil contempt for giving evasive answers. A hearing was held on December 2, 1982, and the government indicated by checkmarks on the grand jury transcripts what answers it considered contumacious. After argument by counsel for Feder, the court instructed counsel for both witnesses to confer with the witnesses to determine whether their recollections could be refreshed and whether they would commence to cooperate with, rather than obstruct, the grand jury. Following that conference, the court directed Weiss

> to return to the Grand Jury and answer these questions that were posed to her, that have been checked off by the Government, with something other than "I don't remember."

(12/2/82 Tr. at 5.) After further colloquy, the court stated:

> THE COURT: I've told the prosecutor to go back and ask these questions again, and I want a bona-fide attempt, and every indication of a bona-fide attempt that, A, she has gone through everything

> Q If you worked less than a full day—did you have a set work day?
> A Of course I had set work days as far as I remember.
> Q But you just don't remember what it was?
> A I don't.
> Q If you worked less than the set day, were you paid for a full day?
> A I assume I wasn't. I don't know. I normally put in full days wherever I am, I am infrequently out. I don't remember, I am sorry.
> Q You don't remember whether you were paid on an hourly basis or—
> A I don't remember.

(11/10/82 Tr. at 12–13.) She did not remember her salary or whether a paycheck for $760 endorsed by her was for more than one week's pay. (11/3/82 Tr. at 22–23.)

and searched out every possible source to answer these questions, and if she has no means in finding out the answers, if she explains it satisfactorily to the Grand Jury, they may or may not accept it. It's certainly going to be a lot more acceptable to me.

. . . .

MR. HEINEMANN: I only wish to clarify one thing, your Honor has suggested, and this was in the earlier argument, at least the portion of which I was present for, that your Honor believes that it is an obligation of the witness to search out means of refreshing her own recollection.

THE COURT: Yes, I do.

(*Id.* at 8–9.)

Weiss returned to the grand jury on January 26, 1983.[4] Having originally characterized her counselees as students, Weiss now had difficulty answering questions calling them students or describing them as having "participated" in the program:

Q Now with regard to your duties as a counselor at Project Joint, did you actually see students who were participating in the program?

A I would like to speak to my attorney, please.

Q It is now 3:41.

You may be excused.

(Witness leaves grand jury room and returns.)

MS. NORDENBROOK: The witness has been out of the grand jury room for four minutes.

THE FOREPERSON: I would remind you that you are still under oath; do you understand that?

THE WITNESS: I understand that.

I saw people, but I don't know if students is the correct term.

Q Were the people that you saw participating in the Project Joint program?

A Let me speak to my attorney, please.

Q It is now 3:47. You may be excused.

(Witness leaves grand jury room and returns.)

A I don't know if participation is the exact words. I don't remember the exact terms used, but most probably they were trainees or counselees.

Q Were these trainees or counselees involved in the Project Joint program?

A May I speak to counsel, please?

Q I would request that before you leave the grand jury room that the notes that you have before you remain.

A Can I take this out with me now (indicating)? I just wrote the question out.

A Yes, but you should return with them.

(Witness leaves grand jury room and returns.)

A The answer to that is yes. Counsel instructed me to leave the notes outside.

(Ms. Nordenbrook leaves grand jury room and returns.)

Q Can you name one trainee or counselee that you saw in that two and a half years that you worked at Project Joint?

A I don't remember. I'm sorry.

Q You cannot name one trainee or counselee; is that correct?

A I don't remember.

Q Just to repeat my question.

What is the name of one counselee or trainee?

A I would like to speak to my attorney, please.

Q You may.

(Witness leaves grand jury room.)

. . . .

(Witness returns to grand jury room.)

BY MS. NORDENBROOK: (continued)

Q Please let the record indicate that the witness has been gone from the grand jury room for nine minutes.

A I answered your question to the best of my ability.

---

4. The delay in Weiss's return was caused by conflicting obligations of counsel for the government and of counsel for Weiss, and by Weiss's refusal to testify further without a new grant of immunity. A new order of immunity was signed on January 26, 1977.

Counsel has advised me that I have already answered your question, that it is improper for you to repeat your question to me.

(1/26/83 Tr. at 3–6.) Immediately after this colloquy, when the Assistant United States Attorney informed Weiss that she was not permitted to record the grand jury's questions and take them out of the room to confer with her attorney, Weiss again conferred with counsel. Upon her return she refused to testify further under such a restriction.

The government immediately renewed its application to have Weiss held in contempt. It took the position that the court had held the required hearing on December 2, 1982, and had at that time given Weiss the opportunity to purge herself of the contempt and that no further hearing was required. The court instructed the parties to appear the next morning, January 27, 1983.

On January 27, the court, after hearing argument from counsel, held Weiss in contempt. With respect to Weiss's first appearance before the grand jury, on November 3, 1982, the court found that Weiss had given 25 evasive answers and had claimed 19 failures of recollection. With respect to her second appearance, on November 10, the court found 27 additional evasive answers and 34 additional failures of recollection.[5] The court found that Weiss's responses followed a pattern that revealed their falsehood:

> After reading these Grand Jury minutes, I find that there was a pattern of conduct, of inability to remember and/or evasive answers as to:
>
> One, the people she counselled—if any—as part of her work for Project Joint;
>
> Two, what she counselled such persons about;
>
> Three, the names of any counselees and the ages of any counselles—parenthetically she was asked what ages, and she answered: Adolescents, and when it was

pointed out that Federal funds are not to be used for that purpose, she switched to adults and then she couldn't remember what ages they were;

> Four, the names of the persons with whom she worked in her office;
>
> Five, the forms she completed or was required to complete;
>
> Six, recognition of her printing or handwriting on documents bearing her name.
>
> Seven, the names and numbers of other counselors doing similar work to which she was doing or allegedly doing;
>
> Eight, any kind of a description of her duties;
>
> Nine, any hours that she worked, the dates of her employment, and even the address at which her office was.
>
> The testimony that I read this morning in the November 24, 1982, and January 26, 1983 sessions, was a compounding of that pattern, to the point where she couldn't answer anything without running outside and talking to her counsel for some protracted period of time and the total effect is one of utter incredibility, utter falsehood and utter contempt for the Grand Jury and its processes, and indeed utter contempt for this Court, who has given her, Ms. Weiss, more than sufficient time in which to go before the Grand Jury and answer the questions put to her in a truthful manner.

(1/27/83 Tr. at 20–21.)

Accordingly, the court sentenced Weiss as follows:

> THE COURT: All right.
>
> Having held Ms. Weiss in contempt, I will sentence her to a period of six months in jail, or the duration—or the termination date of this Grand Jury, whichever occurs first, and I will tell Ms. Weiss that she holds the key to her release, by merely communicating with Ms. Nordenbrook that she is prepared to answer the questions fully and truthfully

---

5. The court indicated that there was some overlapping of the categories and that the count might not be precise; but it found that there was a total of approximately 100 answers that it would call evasive or failure-of-recollection answers.

that were put to her, which I don't believe has been done.

(*Id.* at 32–33.) As to Weiss's ability to secure her release by recanting her prior refusals to give responsive answers, the court stated as follows:

> THE COURT: ....
>
> The recantation will not be deemed satisfactory, if after every question, or even after every tenth question, she insists upon running out and talking to her counsel.
>
> She is going to go in there and give an accurate and correct statement of the truth without running in and out, because if she is going to run in and out, and have her counsel feed her answers that are evasive, and contemptuous, she might as well forget it.

(*Id.* at 30.)

This appeal followed.[6] Weiss contends principally that the contempt adjudication was beyond the court's power under 28 U.S.C. § 1826(a), and that her contempt was not proven by clear and convincing evidence. We reject the former argument but find a certain merit in the latter.

## II. APPLICABILITY OF § 1826(a) TO EVASIVE ANSWERS

■ Entitled "Recalcitrant Witnesses," 28 U.S.C. § 1826(a) provides as follows:

> (a) Whenever a witness in any proceeding before or ancillary to any court or grand jury of the United States refuses without just cause shown to comply with an order of the court to testify or provide other information, including any book, paper, document, record, recording or other material, the court, upon such refusal, or when such refusal is duly brought to its attention, may summarily order his confinement at a suitable place until such time as the witness is willing to give such testimony or provide such

information. No period of such confinement shall exceed the life of—

> (1) the court proceeding, or
>
> (2) the term of the grand jury, including extensions,

before which such refusal to comply with the court order occurred, but in no event shall such confinement exceed eighteen months.

Weiss contends that, as a matter of law, a court has no power under § 1826(a) to hold in contempt as a recalcitrant witness a person who does not refuse outright to answer the grand jury's questions but rather gives answers that the court concludes are false or evasive. Given the traditional powers of the court to deal with obdurate witnesses and the types of conduct that historically have prompted the exercise of its contempt powers, we conclude that § 1826(a) reaches refusals to answer disguised as evasive responses.

### A. *Sanctions for Contempt*

■ Acts of willful disobedience to clear and unambiguous orders of the court constitute contempt of court. *Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 441, 31 S.Ct. 492, 498, 55 L.Ed. 797 (1911). It is fundamental that the court has the power to deal with such disobedience in ways designed either to punish or to compel compliance.

> "The power to punish for contempts is inherent in all courts; its existence is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders and writs of the courts, ...." [*Ex parte Robinson,* 86 U.S. (19 Wall.) 505, 510, 22 L.Ed. 205 (1873)]

> ....

> "The exercise of this power has a twofold aspect, namely: first, the proper

---

**6.** Weiss immediately moved to remain at liberty pending appeal. That motion was denied on January 28, 1983, by a panel which ordered that the appeal be expedited. A renewed motion was granted on February 3, 1983, by the panel which heard the appeal, and Weiss was released on that date pending determination of this appeal. Since Weiss is not currently incarcerated, the provision of § 1826(b), requiring that an appeal from an order of confinement under § 1826(a) be disposed of within thirty days of the filing of the appeal, is not applicable. *In re Rosahn,* 671 F.2d 690, 693–94 (2d Cir.1982).

punishment of the guilty party for his disrespect to the court or its order, and the second, to compel his performance of some act or duty required of him by the court, which he refuses to perform." [*In re Chiles,* 89 U.S. (22 Wall.) 157, 168, 22 L.Ed. 819 (1874)]

*Bessette v. W.B. Conkey Co.,* 194 U.S. 324, 327, 24 S.Ct. 665, 666, 48 L.Ed. 997 (1904).

If the disobedient behavior is conduct of a continuing nature which the contemnor has the power to terminate, the court may choose to hold the contemnor in civil contempt and impose a sanction that is designed to coerce the contemnor to terminate his contumacious conduct. *E.g., Shillitani v. United States,* 384 U.S. 364, 368, 86 S.Ct. 1531, 1534, 16 L.Ed.2d 622 (1966). The sanction generally takes the form of a jail term or a monetary fine; but it is not intended to be punitive, and the court's order will normally provide that the imprisonment or fine is to end as soon as the contemnor ends his contumacious behavior. *See, e.g., id.; Gompers v. Bucks Stove & Range Co., supra,* 221 U.S. at 441–42, 31 S.Ct. at 498; *In re Irving,* 600 F.2d 1027, 1037 (2d Cir.), *cert. denied,* 444 U.S. 866, 100 S.Ct. 137, 62 L.Ed.2d 89 (1979); *In re Nevitt,* 117 F. 448, 461 (8th Cir.1902) (civil contemnors "are imprisoned only until they comply with the orders of the court . . . . They carry the keys of their prison in their own pockets.").

If the court seeks to punish the contemnor for his past contumacy, it may treat the conduct as criminal contempt and impose a jail term or a monetary fine as vindication of the court's authority. *See* 18 U.S.C. § 401 (1976) (a federal court "shall have power to punish by fine or imprisonment, at its discretion, . . . (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command."). Since the sanction imposed following an adjudication of criminal contempt is designed to punish rather than to coerce obedience in the future, the court's order does not permit the contemnor to terminate the punishment

by ending his contumacious behavior. *See Gompers v. Bucks Stove & Range Co., supra,* 221 U.S. at 441–43, 31 S.Ct. at 498–99; *In re Irving, supra.*

■ Many forms of disobedience may be dealt with either as acts of civil contempt, or as acts of criminal contempt, or as both. *United States v. United Mine Workers,* 330 U.S. 258, 299, 67 S.Ct. 677, 698, 91 L.Ed. 884 (1947) (same "conduct can amount to both civil and criminal contempt"); *Bessette v. W.B. Conkey Co., supra,* 194 U.S. at 329, 24 S.Ct. at 667 ("It may not be always easy to classify a particular act as belonging to either one of these two classes. It may partake of the characteristics of both."). The difference between civil contempt and criminal contempt, assuming voluntary conduct of a continuing nature, resides, therefore, in the character of the court's sanction:

> Contempts are neither wholly civil nor altogether criminal . . . . [W]hether the proceedings be civil or criminal, there must be an allegation that in contempt of court the defendant has disobeyed the order, and a prayer that he be attached and punished therefor. It is not the fact of punishment but rather its character and purpose that often serve to distinguish between the two classes of cases. If it is for civil contempt the punishment is remedial, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court.

*Gompers v. Bucks Stove & Range Co., supra,* 221 U.S. at 441, 31 S.Ct. at 498.

■ The proceedings leading to adjudications of civil contempt and criminal contempt are not identical. Criminal contempts are governed by Fed.R.Crim.P. 42, which provides that if the contumacious conduct was not committed in the actual presence of the court, the alleged contemnor will be entitled to notice, a hearing, and, in certain instances, a jury trial.[7] We

---

7. Fed.R.Crim.P. 42 provides as follows:

(a) Summary Disposition. A criminal contempt may be punished summarily if the

have held that proceedings in civil contempt too must be accorded some of the safeguards provided by Fed.R.Crim.P. 42, *see In re Sadin,* 509 F.2d 1252, 1255 (2d Cir.1975), such as notice and an opportunity to prepare a defense, *In re Fula,* 672 F.2d 279, 283 (2d Cir.1982); but the trial need not be by jury. In a criminal contempt proceeding, because criminal contempt "is a crime in the ordinary sense; . . . a violation of the law, a public wrong," *Bloom v. Illinois,* 391 U.S. 194, 201, 88 S.Ct. 1477, 1481, 20 L.Ed.2d 522 (1968), and the sanction is designed to punish to a fixed degree, over which the contemnor is given no control, the government must establish its case beyond a reasonable doubt. *See Michaelson v. United States ex rel. Chicago, St. Paul, Minneapolis & Omaha Railway Co.,* 266 U.S. 42, 66, 45 S.Ct. 18, 20, 69 L.Ed. 162 (1924); *In re Williams,* 509 F.2d 949, 960 (2d Cir.1975). In a civil contempt proceeding the government need not prove its case beyond a reasonable doubt, but because the sanction may deprive the contemnor of his liberty for some period, the government must prove its case by " 'clear and convincing' proof of violation of a court decree; a bare preponderance of the evidence will not suffice." *Hart Schaffner & Marx v. Alexander's Department Stores,* 341 F.2d 101, 102 (2d Cir.1965); *In re Bongiorno,* 694 F.2d 917, 922 (2d Cir.1982); *In re Battaglia,* 653 F.2d 419, 423 (9th Cir.1981); *In re Irving, supra.*

## B. *Traditional Treatment of Testimonial Obduracy*

Testimonial obduracy by a witness who has been ordered by the court to answer

questions may take any of a number of forms. The witness may refuse categorically to answer. Or he may respond in a way that avoids providing information, as, for example, by denying memory of the events under inquiry, denying acquaintance with targets of the inquiry, or denying knowledge of facts sought to be elicited. Or he may purport to state informative facts in response to the questions while in fact testifying falsely.

Any of these three forms of obduracy may be met with the imposition of one or more judicial or governmental sanctions. For example, when the witness has refused to answer questions, he may be adjudged in civil contempt and ordered to answer, *e.g., Shillitani v. United States, supra,* 384 U.S. at 370, 86 S.Ct. at 1535; *In re Grand Jury Investigation of Giancana,* 352 F.2d 921 (7th Cir.), *cert. denied,* 382 U.S. 959, 86 S.Ct. 437, 15 L.Ed.2d 362 (1965); or he may be adjudged in criminal contempt and punished for his past failure to answer, *e.g., Brown v. United States,* 356 U.S. 148, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958). In some cases both coercive and punitive sanctions have been imposed. *See, e.g., Yates v. United States,* 355 U.S. 66, 74, 78 S.Ct. 128, 133, 2 L.Ed.2d 95 (1957); *United States v. Petito,* 671 F.2d 68 (2d Cir.1982); *In re Irving, supra.*

If the witness has responded falsely to the questions propounded, he may be subject to prosecution for a criminal offense in violation of, *e.g.,* 18 U.S.C. § 1621 (perjury), or 18 U.S.C. § 1623 (false declarations before grand jury or court). If the witness's false testimony has obstructed the court in

judge certifies that he saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court. The order of contempt shall recite the facts and shall be signed by the judge and entered of record.

(b) Disposition Upon Notice and Hearing. A criminal contempt except as provided in subdivision (a) of this rule shall be prosecuted on notice. The notice shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts constituting the criminal contempt charged and describe it as such. The notice shall be given orally

by the judge in open court in the presence of the defendant or, on application of the United States attorney or of an attorney appointed by the court for that purpose, by an order to show cause or an order of arrest. The defendant is entitled to a trial by jury in any case in which an act of Congress so provides. He is entitled to admission to bail as provided in these rules. If the contempt charged involves disrespect to or criticism of a judge, that judge is disqualified from presiding at the trial or hearing except with the defendant's consent. Upon a verdict or finding of guilt the court shall enter an order fixing the punishment.

the performance of its duty, the witness may be met with sanctions for civil contempt, *see Ex parte Hudgings,* 249 U.S. 378, 383, 39 S.Ct. 337, 339, 63 L.Ed. 656 (1919), or criminal contempt, *see In re Michael,* 326 U.S. 224, 227–29, 66 S.Ct. 78, 79–80, 90 L.Ed. 30 (1945).

The middle category of testimonial obduracy, *i.e.,* the witness's equivocal responses or disclaimers of knowledge or memory, has also been dealt with as contemptuous conduct, warranting sanctions that were coercive, punitive, or both. It has long been the practice of courts viewing such testimony as false and intentionally evasive, and as a sham or subterfuge that purposely avoids giving responsive answers, to ignore the form of the response and treat the witness as having refused to answer. *See, e.g., In re Schulman,* 167 F. 237 (S.D.N.Y.1909), *aff'd,* 177 F. 191 (2d Cir.1910); *United States v. Appel,* 211 F. 495 (S.D.N.Y.1913); *United States v. McGovern,* 60 F.2d 880, 889 (2d Cir.), *cert. denied,* 287 U.S. 650, 53 S.Ct. 96, 77 L.Ed. 561 (1932); *Schleier v. United States,* 72 F.2d 414 (2d Cir.), *cert. denied,* 293 U.S. 607, 55 S.Ct. 123, 79 L.Ed. 697 (1934); *In re Eskay,* 122 F.2d 819 (3d Cir. 1941); *Howard v. United States,* 182 F.2d 908 (8th Cir.), *vacated and remanded as moot,* 340 U.S. 898, 71 S.Ct. 278, 95 L.Ed. 651 (1950); *Richardson v. United States,* 273 F.2d 144 (8th Cir.1959); *Martin-Trigona v. Gouletas,* 634 F.2d 354, 357–59 (7th Cir.), *cert. denied,* 449 U.S. 1025, 101 S.Ct. 593, 66 L.Ed.2d 486 (1980); *In re Battaglia, supra,* 653 F.2d at 422; *In re Bongiorno, supra.*

In *In re Schulman,* for example, the district court found that a bankrupt's repeated responses of "I don't remember" and "What do you mean?" to questions concerning the disposition of his assets in the six months preceding his declaration of bankruptcy were disingenuous and evasive. The court thus construed the responses as refusals to answer and imposed a combination of civil and criminal contempt sanctions by ordering the witness imprisoned for six months, with the proviso that if the witness chose, after five days, to provide nonevasive answers, he would be released from prison. This Court affirmed, stating as follows:

The testimony as it appears in the record evinces a deliberate purpose to conceal the truth and prevent the trustee from becoming possessed of facts which would lead to a recovery of the missing property. The witness was being asked regarding transactions directly within his knowledge and facts which he must have known. When, therefore, he answered repeatedly "I don't remember," it is obvious that he was deliberately withholding information to which the trustee was entitled. In effect his attitude was one of defiance. He did not affirmatively tell the referee that he refused to disclose the facts which would enable the trustee to follow the property, although these facts were well known to him, but his conduct produced the same result as if he had stated his purpose openly.

177 F. at 193.

In the often cited case of *United States v. Appel,* the court treated the witness's professed inability to recall how he had disposed of $940 withdrawn from a bank one week earlier as a refusal to answer. In imposing criminal contempt sanctions, Judge Learned Hand stated as follows:

It is indeed impossible logically to distinguish between the case of a downright refusal to testify and that of evasion by obvious subterfuge and mere formal compliance.

. . . If the witness' conduct shows beyond any doubt whatever that he is refusing to tell what he knows, he is in contempt of court. That conduct is, of course, beyond question when he flatly refuses to answer, but it may appear in other ways. A court, like any one else who is in earnest, ought not to be put off by transparent sham, and the mere fact that the witness gives some answer cannot be an absolute test. For instance, it could not be enough for a witness to say that he did not remember where he had slept the night before, if he was sane and sober, or that he could not tell whether he had been married more than a week. If a court is to have any power at all to

compel an answer, it must surely have power to compel an answer which is not given to fob off inquiry. 211 F. at 495–96. Similarly, in *United States v. McGovern, supra,* this Court upheld a criminal contempt adjudication against a witness who would not unequivocally state how he disposed of the proceeds of five checks payable to him in the total sum of $380,000:

> ... [P]lainly having resorted persistently to subterfuge and evasion, if not to deliberate falsifying, to prevent a disclosure of what knowledge he had and was asked to give, he was guilty of obstructing the grand jury in performing its duties, and was properly held in contempt.

60 F.2d at 890.[8]

In *Howard v. United States, supra,* the district court ruled that a witness who had given false and evasive testimony before a grand jury as to the source of $18,000 deposited in her bank accounts during a six-year period, had been " 'obstructive, evasive, perjurious and contumacious, and that she [had been and was] deliberately, willfully, and contumaciously obstructing the investigation of' " the grand jury. 182 F.2d at 912 (quoting district court's findings). The court held the witness in civil contempt, ordering that she be imprisoned until she testified truthfully and nonevasively. The court of appeals affirmed, stating that "[i]f the appellant's conduct constituted contempt, we think it is not important whether it was treated as a civil or a criminal contempt or as both," 182 F.2d at 914; "a District Court has power to deal summarily with a witness before a Grand Jury

who is guilty of a patent evasion equivalent to a refusal to give any material information," *id.* at 915.

■ A majority of the above cases involved rulings that the evasive witness was guilty of criminal contempt and the impositions of punitive sanctions, and Weiss seeks to deny their relevance on that basis. This is an astigmatic view which misperceives the focus of our inquiry. In considering whether a witness's obduracy may be considered a refusal to answer, and hence "recalcitrance" under § 1826(a), or must instead be dealt with in a proceeding in criminal contempt or a prosecution for perjury or obstruction of justice, we must take care not to confuse the nature of the conduct with the nature of the judicial or governmental response to it. If conduct is tantamount to a willful refusal to obey an order of the court, and the contemnor has the power to end his contumacy, a court may impose criminal contempt sanctions, or civil contempt sanctions, or both. The nature of the court's response does not alter the character of the conduct, and the determination of the appropriate response is committed largely to the court's discretion. As the Supreme Court stated in *Brown v. United States, supra,*

> Whatever differences the potentially drastic power of courts to punish for contempt may have evoked, a doubt has never been uttered that stubborn disobedience of the duty to answer relevant inquiries in a judicial proceeding brings into force the power of the federal courts to punish for contempt. Trial courts no doubt must be on guard against confusing offenses to their sensibilities with ob-

---

**8.** *See also Collins v. United States,* 269 F.2d 745 (9th Cir.1959), *cert. denied,* 362 U.S. 912, 80 S.Ct. 662, 4 L.Ed.2d 620 (1960), in which the witness, who had been convicted, after his plea of guilty, of the killing of one Thomas during a burglary, testified before a grand jury investigating whether Thomas had in fact been murdered to prevent his testimony in a narcotics investigation. The witness gave the grand jury three wholly different and inconsistent accounts of how Thomas had been killed. The court of appeals upheld a criminal contempt citation because the witness's testimony was

> "so plainly inconsistent, so manifestly contradictory, and so conspicuously unbelievable as to make it apparent from the face of the record itself that the witness has deliberately concealed the truth and has given answers which are replies in form only and which, in substance, are as useless as a complete refusal to answer."

*Id.* at 750 (quoting *Finkel v. McCook,* 247 A.D. 57, 63, 286 N.Y.S. 755, 761 (1st Dep't 1936)).

struction to the administration of justice. It is no less important for this Court to use self-restraint in the exercise of its ultimate power to find that a trial court has gone beyond the area in which it can properly punish for contempt. We are not justified in sliding from mere disagreement with the way in which a trial court has dealt with a particular matter, such as petitioner's conduct in the present case, into a condemnation of the court's action as an abuse of discretion.

356 U.S. at 153–54, 78 S.Ct. at 626.

C. *Section 1826(a)*

Section 1826 was enacted by Congress in 1970 as part of the Organized Crime Control Act, Pub.L. No. 91–452, 84 Stat. 922, 932 (1970), to deal with "recalcitrant witnesses." Section 1826(a), which is set forth in full in the introduction preceding Part A above, was intended to give courts the power "summarily to confine" a witness for limited periods of time when the witness "unjustifiably refuses to testify or produce other information." H.R.Rep. No. 1549, 91st Cong., 2d Sess. 46, *reprinted in* 1970 U.S.Code Cong. & Ad.News 4007, 4022. Weiss argues that the language and history of § 1826(a) reveal that Congress intended the section to reach only outright refusals to testify and not evasive answers. We disagree.

Weiss contends that the language of § 1826(a), permitting the civil contempt sanction for a witness who "refuses ... to comply with an order of the court to testify," does not extend that power with respect to a witness who makes some response to the questions. She contends that this interpretation is required by remarks during the floor debates on § 1826 in which members of Congress distinguished between answers that would constitute the crime of perjury and nonanswers that would constitute civil contempt. *See, e.g.,* 116 Cong.Rec. 35197 (1970) (Statement of Congressman McCulloch) ("If [witnesses] refuse to talk, they may be held in civil contempt .... If they talk but do not speak the truth, they may be tried for perjury."); *see also* 116 Cong.Rec. 35311, 35321,

35327, 35328 (1970) (Statements of Congressmen Flowers, Price, Randall, and Meskill, respectively). These statements certainly recognized the fact that different sanctions could be imposed for different types of conduct, and they suggest that it was not Congress's intent to permit summary confinement in response to a simple perjury. But the statements relied on cannot reasonably be viewed as an attempt to lock together a particular type of conduct and a particular sanction in an unvarying two-step. For example, Congress can hardly be thought, by having stated that a refusal to talk may result in an adjudication of civil contempt, to have eliminated the court's power to deal with such a refusal as a *criminal* contempt. Nor is there any indication that Congress sought to draw bright lines between various types of testimonial obduracy on the basis of form rather than substance. Thus, we do not construe the legislative history of § 1826(a) as disclosing any congressional intention to limit the court's powers to deal with conduct that may in essence constitute both a contumacious refusal to testify and a perjurious effort at evasion.

Indeed, there are explicit indications that Congress did not intend to curtail the courts' existing practice with respect to the imposition of civil contempt sanctions on obdurate witnesses. It was recognized that civil contempt sanctions have their roots in the "ancient" notion "that courts have the power to enforce compliance with their lawful orders." 116 Cong.Rec. 588 (1970) (remarks of Sen. McClellan), and § 1826(a) was viewed as merely a "codif[ication of] existing Federal civil contempt proceedings designed to deal with recalcitrant witnesses in Federal grand jury and court proceedings." S.Rep. No. 617, 91st Cong., 1st Sess. 33; *see also Gelbard v. United States,* 408 U.S. 41, 42 n. 1, 92 S.Ct. 2357, 2358 n. 1, 33 L.Ed.2d 179 (1972); H.R.Rep. No. 1549, *supra,* at 33, 46, *reprinted in* 1970 U.S.Code Cong. & Ad.News at 4008, 4022. As discussed in Part II.B. above, the courts had, long prior to 1970, considered it sound practice not to be gulled by the form of a

witness's uninformative response to a question, but instead to determine whether in fact the witness was being equivocal and evasive and, in substance, was refusing to answer. As stated in the venerable *United States v. Appel,* "[t]he mere fact that the witness gives some answer cannot be an absolute test." 211 F. at 495. We conclude, therefore, that § 1826(a)'s conception of recalcitrance incorporates the principle of the *Appel* line of cases, that deliberately evasive answers constitute refusals to answer.[9]

*In re Michael, supra,* and *Ex parte Hudgings, supra,* relied on by Weiss, do not support her contention that false evasive answers cannot, as a matter of law, be viewed as recalcitrance within the meaning of § 1826(a). In *Michael,* the Supreme Court reversed the criminal contempt citation of a witness whose answers to a number of questions as to the purposes of certain checks had been found "false and evasive" by the district court. The court of appeals had concluded that the witness "had not refused to answer questions, and that his testimony could not 'fairly be characterized as unresponsive in failing to give direct answers to the questions asked him,' " 326 U.S. at 225, 66 S.Ct. at 78 (quoting court of appeals decision), and the Supreme Court agreed that the witness "had directly responded with unequivocal answers," *id.* at 226, 66 S.Ct. at 79. Such unequivocal, "clearcut" answers, *id.* n. 2, the Court found, might constitute perjury, *id.* at 226, 66 S.Ct. at 79 ("These unequivocal answers were clear enough so that if they are shown to be false petitioner would clearly be guilty of perjury."), but they could not be viewed as evasive attempts to refuse to testify:

> Here there was, at best, no element except perjury "clearly shown." Nor need we consider cases like *United States v. Appel,* 211 F. 495, 496, pressed upon us

by the government. For there the Court thought that the testimony of Appel was "on its mere face, and without inquiry collaterally, . . . not a bona fide effort to answer the questions at all."

*Id.* 326 U.S. at 228–29, 66 S.Ct. at 80.

In *Hudgings,* the Court was confronted with responses by a witness who had been asked to identify handwriting as that of certain persons. The witness testified that "he believed, from having often seen the writing of the persons named, that the writings shown him were theirs, but that he could not so state from having seen [them] write because he could not recollect ever having seen them do so." 249 U.S. at 380, 39 S.Ct. at 338. After extensive cross-examination, the witness adhered to the limitation he had placed on the foundation for his identification of the writing, stating that " 'I cannot say that I can recall that I have ever seen him in the act of writing. I would not say I have not, but I would not say that I have.' " *Id.* at 381, 39 S.Ct. at 339. The district court ruled the witness in contempt because it was satisfied that this answer was false, and it ordered that the witness be imprisoned until he was willing to answer the question truthfully. The Supreme Court reversed on the ground that the court does not have the power "in every case where [it] is of the opinion that a witness is committing perjury" to punish for contempt. *Id.* at 382, 39 S.Ct. at 339. The contempt sanctions are to be reserved for those testimonial obduracies, whether perjured or not, which obstruct the tribunal in the performance of its duties:

> An obstruction to the performance of judicial duty resulting from an act done in the presence of the court is, then, the characteristic upon which the power to punish for contempt must rest. This being true, it follows that the presence of that element must clearly be shown in every case where the power to punish for

**9.** Weiss also argues that § 1826(a) is inapplicable because "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity," *Rewis v. United States,* 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971). We view this principle as inapposite here be-

cause, in light of Congress's stated intention to codify existing civil contempt practice, we do not believe that § 1826(a) is ambiguous. *See Albernaz v. United States,* 450 U.S. 333, 342–43, 101 S.Ct. 1137, 1144, 67 L.Ed.2d 275 (1981).

contempt is exerted—a principle which, applied to the subject in hand, exacts that in order to punish perjury in the presence of the court as a contempt there must be added to the essential elements of perjury under the general law the further element of obstruction to the court in the performance of its duty. As illustrative of this, see *United States v. Appel,* 211 Fed.Rep. 495.

*Id.* 249 U.S. at 383, 39 S.Ct. at 339–40.

We find *Michael* and *Hudgings* instructive for the present case in several respects. In *Michael,* the Supreme Court took care to note that the witness's answers were not in fact equivocal and thus were not susceptible to being characterized as refusals to answer. It expressly distinguished, with no semblance of criticism, the principle embodied by cases such as *Appel,* that transparently false evasions and sham claims of memory failure are tantamount to a downright refusal to testify. In *Hudgings,* the Court ruled merely that a court cannot impose sanctions for contempt "in every case" in which it believes a perjury has been committed. And it cited *Appel* as illustrative of a case in which a contempt citation with respect to false testimony was proper. The further fact that the Court in *Hudgings,* a civil contempt case, illustrated the conduct that would justify that sanction by referring to *Appel,* a criminal contempt case, confirms our view that, in fathoming the nature of recalcitrance, we must focus on the character of the conduct rather than the character of the court's response to it.

We are aware of only two reported decisions discussing the applicability of § 1826(a) to a witness whose responses are equivocations rather than outright refusals to answer. One is our decision earlier this Term in *In re Bongiorno, supra,* and the other is *In re Battaglia, supra. See also Martin-Trigona v. Gouletas, supra* (so applying § 1826(a) without discussion). In *Bongiorno* we focused on the character of the conduct at issue, and construed, in the circumstances, the witness's responses of lack of knowledge or lack of memory as plainly false and evasive assertions de-signed to impede the grand jury's investigation. In *Battaglia,* the court remanded for a determination of whether the government had met the "clear and convincing evidence" test. But both courts interpreted § 1826(a) to reach this form of recalcitrance, and this interpretation is well within the teaching of *Michael* and *Hudgings.*

In sum, we conclude that long prior to the enactment of § 1826(a), courts had consistently imposed contempt sanctions, both criminal and civil, on witnesses who gave obviously false evasive and equivocal answers in an effort to avoid providing information. Section 1826(a) codified this practice and thus may be applicable to the conduct of Weiss.

### III. PROPRIETY OF THE CIVIL CONTEMPT SANCTION IN THE PRESENT CASE

The question remains whether the district court in the present case abused its discretion by holding Weiss in civil contempt for her responses to questions concerning the details of her employment as a counselor with Project Joint and ordering her to provide detailed information as to such matters as the persons with whom she worked and persons she counseled. The witness's recalcitrance must be established by clear and convincing evidence. *E.g., In re Bongiorno, supra; In re Battaglia, supra,* 653 F.2d at 423. The district judge recognized this standard of proof, but we conclude that he erred in finding that it had been met.

In *Bongiorno,* we pointed out that, in order to carry its burden of establishing recalcitrance in the form of false assertions of absence of memory, the government must show, by clear and convincing evidence, that the witness's claimed lack of memory was not credible. We noted that "[s]uch evidence may include extrinsic proof, such as tape recordings, documents, or photographs; or it may be found in the witness's demeanor and his answers, if the pattern and substance of those answers convinces the court that the answers are inherently incredible." 694 F.2d at 922. In that case we found that adequate proof had been

presented principally in the form of photographs of various persons including the witness in which the witness professed to recognize no one, and the selectivity with which the witness's memory failed. In *Bongiorno* it seemed quite evident that the witness had the knowledge and memory that he denied.[10]

The present case shares certain obvious characteristics with *Bongiorno* and the cases discussed in Part II.B. above. Like Bongiorno's, Weiss's memory failures, as the district court found, followed a certain pattern in that she claimed an inability to provide unequivocally any details as to a particular subject, *i.e.*, her job at Project Joint. Like the witness in *In re Schulman, supra*, for example, Weiss professed not to remember—53 times in her first two grand jury appearances, according to the district court's count—and she professed not to understand questions concerning the nature of Project Joint and quibbled with various questions' terminology though she had previously phrased her answers in just such terms.

■ Unlike *Bongiorno*, however, there was here no extrinsic evidence to contradict Weiss's claimed inability to remember. Thus, the court was compelled to rely simply on the intrinsic credibility—or lack of it—of Weiss's answers. We are inclined to agree with the district court's assessment that it is inherently incredible that a 34-year-old person, with no traumatic or medicinal reason for a memory loss, who worked for one-and-a-half years at a job that ended less than five years earlier would retain virtually no memory of any detail as to her salary, her hours, her co-workers, people she counseled, where she worked, where she lived at the time, or the nature of what she did. Nonetheless, we are constrained to reverse the court's holding Weiss in civil contempt for having refused to give this information, for we find lacking any clear and convincing evidence of the truth of the district court's basic premise, *i.e.*, that Weiss actually worked at the job she is said to have held at Project Joint.

The supposition that Weiss worked as a counselor at Project Joint comes from the records of the organization and from answers of Weiss that are relatively clearcut.[11] But the thrust of the grand jury's investigation suggests that in fact she may not have worked as a counselor there. The grand jury is inquiring into whether Project Joint claimed funds for nonexistent CETA trainees, supported its claims by means of fraudulent documentation, and thereby obtained one million dollars in CETA funds for having trained no one at all. Thus, the very nature of the inquiry and the absence of any employment documentation that is not treated as suspect by the inquiry itself suggest that Weiss may have no details to give. If there were no counselees, there would have been little need for a counselor. If false documents were filed, the Project's books showing Weiss as a counselor have little credibility. If false claims were made for training expenses, supposed "salary checks" from Project Joint made payable to Weiss do not mean that she worked there.

The absence of credited extrinsic evidence of the factual premise for the detailed questioning of Weiss distinguishes the present circumstances from those cases in which evasive answers were held refusals to answer. For example, in *Appel*, there was concrete evidence of bank account withdrawals and the question was how the witness had spent the money; in *McGovern*

---

10. We note that, as indicated in Part I above, the district court in the present case took the position that Weiss was required to make an effort to obtain information in order to respond to the general jury's questions, to "go[ ] through everything and search[ ] out every possible source to answer these questions." (12/2/82 Tr. at 8.) We are aware of no authority imposing such an obligation on a witness or requiring him to refresh his own recollection

and we do not believe there is one. The assertion of a bona fide lack of information or absence of memory does not constitute contumacy.

11. Weiss testified that "[Project Joint] was a program I worked for," (11/3/82 Tr. at 4), and "[m]y job, basically, was counseling," (*id.* at 17); "I counseled for Project Joint" (*id.* at 19).

the same question was asked with respect to money reflected in checks payable to the witness; in *Howard,* there was evidence of bank deposits and the question was the origin of the money. The questioning of the witnesses in each case proceeded from the unimpeachable premise that the financial transactions had occurred; the witnesses' evasions were considered deliberate refusals to answer only because "[their] testimony [was] considered in connection with the known and undisputed circumstances," *Schleier v. United States, supra,* 72 F.2d at 417, and the questions sought to elicit "facts which [they] *must* have known." *In re Schulman, supra,* 177 F. at 193 (emphasis added).

Given the absence here of clear and convincing evidence that Weiss did work as a counselor at Project Joint, and given the thrust of the grand jury's investigation, we conclude that there are no "undisputed circumstances" such as existed in the above cases. As a result, there is no clear evidence that Weiss "must ... know[ ]" the details surrounding her supposed job. If Weiss did not work at Project Joint, she in fact can have no memory of hours, or coworkers, or counselees, and her professed inability to supply details as to that employment should not have been construed as refusals to answer.

The questions that Weiss has been ordered to answer are those seeking the details of her employment as a counselor at Project Joint. If Weiss did not in fact have that job she will never have the ability to answer many of those questions and, as a practical matter, will not have the keys to her prison in her pocket. Since the "justification for coercive imprisonment as applied to civil contempt depends upon the ability of the contemnor to comply with the court's order," *Shillitani v. United States, supra,* 384 U.S. at 371, 86 S.Ct. at 1536; *see also United States v. Wendy,* 575 F.2d 1025, 1030–31 (2d Cir.1978), and since Weiss's wherewithal to give details is suspect, the imposition of the coercive sanction of civil contempt was inappropriate.

It might be argued that the civil contempt order is sustainable on the ground that if in fact Weiss cannot answer the questions as to the details of her counseling job with Project Joint because she had no such job, she nevertheless has the keys to her prison in her pocket because she could simply recant her predicate testimony that she did work as a counselor at Project Joint. We disagree. Bypassing the technical obstacle that Weiss has not in fact been ordered to recant this predicate testimony, the fundamental difficulty with the argument is that such an order would not have been a proper application of § 1826(a). Section 1826(a) deals with recalcitrance, which, as we have discussed above, includes evasive answers that seek to avoid giving information as well as outright refusals to testify. Weiss's testimony that she worked as a counselor at Project Joint, *see* note 11 *supra,* cannot be characterized as a refusal to answer. It may well be false, but it does not appear to be either evasive, or equivocal, or uninformative.

This does not, of course, mean that Weiss has testified falsely with impunity. If she did not work as a counselor at Project Joint, her clearcut testimony that she did so not only exposes her to a possible prosecution for perjury, but also, assuming that an appropriate factfinder finds that her false testimony and misleading claims of lack of memory obstructed the grand jury's inquiry, exposes her to the possibility of punishment for criminal contempt. *In re Michael, supra.* Such a criminal contempt proceeding has not to our knowledge been commenced. If one is commenced, it must, of course, be conducted in accordance with the appropriate procedures.

## CONCLUSION

Had there been clear and convincing evidence that Weiss worked as a counselor at Project Joint, we would have upheld the civil contempt adjudication under § 1826(a) for her refusal to supply information as to any details. Given the absence of such evidence as to that predicate fact, which is the linchpin both of the finding that her

claimed lack of memory for detail was inherently incredible and of justification for a coercive sanction, we reverse the court's adjudication of civil contempt, and remand for such other proceedings as may be appropriate.

LUMBARD, Circuit Judge, dissenting:

I dissent.

I agree with all of Judge Kearse's thorough and comprehensive opinion except the conclusion reached in Part III that Chanie Weiss's recalcitrance, which amounted to a refusal to testify, was not established by clear and convincing evidence.

As Judge Kearse's opinion demonstrates, Congress, in 1970, codified into law the prevailing views on the power of the courts to deal with witnesses whose conduct illegally obstructs grand jury investigations. Thus, we all agree that 28 U.S.C. § 1826(a) (1976) does not "limit the court's powers to deal with conduct that may in essence constitute both a contumacious refusal to testify and a perjurious effort at evasion."

Here the government, in order to expedite an investigation of misuse of government funds, seeks the remedy of § 1826(a) with summary sanctions imposed by the court. The purpose of the sanctions imposed by Judge Platt is to secure, if possible, the testimony of the witness who has been given immunity. I agree that in this case the burden is on the government to establish by clear and convincing proof that the witness's conduct is contemptuous.

Judge Kearse's detailed recitation of the facts amply demonstrates that the witness's testimony was a deliberate and calculated evasion which amounted to a refusal to testify. My colleagues agree that the testimony appears evasive but nevertheless conclude that the record is lacking in extrinsic evidence that shows that the witness's claimed lack of memory is not credible. In our recent decision in *In re Bongiorno,* 694 F.2d 917, 922 (2d Cir.1982), we said that evidence that the witness's claimed lack of memory is not credible "may [also] be found in the witness's demeanor and his answers, if the pattern and substance of those answers convinces the court that the answers are inherently incredible." Judge Platt was so convinced. Reading this record and Judge Kearse's detailed recital of it, I do not see how we can disagree with the assessment of the district judge.

If, on as clear a record as this, any extrinsic evidence is necessary, it is certainly present here. There are at least two items of extrinsic evidence in the record which to me are relevant. The first is a series of five salary checks, made out to Weiss by "Project Joint, adult work experience," which were dated from March 18, 1977 to June 30, 1978. She did admit, after attempting to evade answering, that the checks, all of which were indorsed by her, were for salary and that she cashed the checks and received the money. Although these salary checks, as Judge Kearse suggests, may be suspect in terms of showing that Weiss actually worked at Project Joint, they obviously establish a tangible relationship between Weiss and Project Joint during the period when she was allegedly employed by that organization. Similar, therefore, to the circumstances in the three cases illustratively cited by Judge Kearse, *United States v. Appel,* 211 F. 495 (S.D.N.Y. 1913); *United States v. McGovern,* 60 F.2d 880 (2d Cir.), *cert. denied,* 287 U.S. 650, 53 S.Ct. 96, 77 L.Ed. 561 (1932); *Howard v. United States,* 182 F.2d 908 (8th Cir.), *vacated and remanded as moot,* 340 U.S. 898, 71 S.Ct. 278, 95 L.Ed. 651 (1950), the questioning of Weiss with respect to the operations of and Weiss's connections with Project Joint did in fact proceed from the "unimpeachable premise" that Weiss knew something about the organization and her own involvement with it.

I would also classify as extrinsic evidence the manner in which Weiss, as Judge Kearse's opinion states, "profusely punctuated" her testimony by leaving the grand jury room to consult counsel. On her first appearance, Weiss left to consult counsel on 23 separate occasions which consumed more than 28 minutes. On November 10, she left four times for an absence of at least 20 minutes. And on her last appearance, eight

legal consultations took at least 21 minutes. Considering the negligible results of any advice in terms of responsive testimony and the resulting delay and waste of the grand jury's time, I think that the nature of such conduct evidences a calculated and deliberate pattern of evasion and refusal.

Rather than deal with the logic of the testimony and the existing extrinsic evidence, Judge Kearse instead suggests the probability that Weiss, contrary to her sworn testimony, never worked at Project Joint and thus reasons that there is no clear evidence that Weiss must know the details surrounding her purported employment. Accordingly, Judge Kearse stresses that what we really have is a case of perjury, and she concludes that since such testimony, if it be perjury, does not appear to be evasive, equivocal, or uninformative, it "cannot be characterized as a refusal to answer."

I do not quarrel with the suppositions that Weiss may never have worked at Project Joint and that she may have committed perjury. Nevertheless, even a strong likelihood that Weiss did not do any work at Project Joint only emphasizes the inherent absurdity of any claim that she cannot remember. Whether she worked there or not is precisely what the grand jury is entitled to know from the one person who must know, and that person is Chanie Weiss.

Under Judge Kearse's analysis, however, Weiss, by perjuring herself on the predicate question of whether she actually worked at Project Joint and then responding to follow-up questions with answers stating a failure to remember, has been able deliberately to obstruct the grand jury process while, simultaneously, circumventing the very sanctions that were enacted to secure the compliance and cooperation of a witness with that process. Such a result is not warranted either by logic or by case law; in short, it makes no sense.

As previously noted, we all agree that Congress, in enacting § 1826(a), "did not intend to curtail the courts' existing practice with respect to the imposition of civil contempt sanctions on obdurate witnesses." Judge Kearse acknowledges that a court traditionally had the power to hold a witness in civil contempt "[i]f the witness's false testimony has obstructed the court in the performance of its duty. . . ." *See also Ex parte Hudgings,* 249 U.S. 378, 383, 39 S.Ct. 337, 339, 63 L.Ed. 656 (1919); *Howard, supra,* 182 F.2d at 913. In *McGovern, supra,* Judge Chase, speaking generally of the contempt power, said: "[A] witness who obstructs the course of justice by so acting that the court's performance of its duty is frustrated is not beyond the reach of the contempt power because he chooses false swearing as the means to his end in so doing." 60 F.2d at 889, *quoted in Howard, supra,* 182 F.2d at 913. The key factor necessary to justify a holding of civil contempt in such a situation is that obstruction *beyond* the mere elements of perjury be shown. *Ex parte Hudgings, supra,* 249 U.S. at 383, 39 S.Ct. at 339; *Howard, supra,* 182 F.2d at 913. Such obstruction may be found where a witness's answers are "evasive, fantastic, and untrue" and their effect and purpose are to " 'thwart the process of inquiry, and to turn a trial [here, a Grand Jury investigation] into a futile form.' " *Howard, supra,* 182 F.2d at 914 (bracketed material in original) (quoting *Clark v. United States,* 289 U.S. 1, 10, 53 S.Ct. 465, 467, 77 L.Ed. 993 (1933)).

It seems to me that Weiss's testimony, when viewed as a whole and in conjunction with the extrinsic evidence, amounted to a transparent refusal to testify. If Weiss did not commit perjury and actually worked at Project Joint, she *must* have known the details surrounding her employment. Thus, a claim of lack of memory as to such details would be evasive. If, on the other hand, she did perjure herself with respect to her predicate testimony concerning the question of employment, she *must* have known that she never did any work for Project Joint, and thus her answers claiming an inability to remember the details of her work would again be evasive. My colleagues seem to acknowledge that by responding to these questions with answers stating a failure of

memory, Weiss has been able deliberately and perjuriously to cover her earlier perjury and still evade any meaningful testimony on the subject of Project Joint. I do not see how such conduct, which acts to "thwart the process of inquiry" and turn the investigation into a "futile form," can amount to anything less than an intentional obstruction of the grand jury process.

Judge Kearse asserts that a holding of civil contempt is inappropriate in this situation on the ground that if Weiss did not actually work at Project Joint she will never be able to terminate her confinement by answering the many questions concerning the details of her employment. I do not find this argument persuasive, however. Weiss had, and still has, the ability to answer these questions by stating simply that she never performed any work for Project Joint.

Accordingly, I do not see how anyone can read this record and reach any conclusion other than the one reached by Judge Platt: that Weiss has refused to answer questions which she obviously is capable of answering.

There has been mounting concern over the increase in white collar crime and the obstructions encountered in investigating and prosecuting those who commit it. Gathering evidence of such crime is time-consuming and difficult for law enforcement agencies and it strains their limited facilities. To enable law enforcement agencies to get the necessary evidence, Congress has provided two essential weapons: the power to secure grants of immunity to witnesses so that they cannot evade testifying by a claim of self-incrimination, and the power to seek sanctions against those witnesses who, despite grants of immunity, refuse to give evidence about matters within their knowledge. Under our system of law, the courts must play their part to see that these powers are effectively and properly used according to law.

But the courts must leave it to the prosecuting authorities to determine how those powers to get evidence are to be used. It is not within the province of judges, and seldom within their knowledge, to determine how evidence may best be secured. Anyone with any experience of law enforcement knows that prosecutions for the crime of perjury are especially difficult. More to the point, such prosecutions invariably fail to produce evidence, and they always result in excessive delay of any investigation. We have no business to tell the prosecutor that he can proceed with a perjury case or even to suggest that he can, alternatively, seek the punitive sanction of criminal contempt. Our business is to determine whether there is a basis for the district court's finding of contempt under § 1826(a). In *Brown v. United States,* 356 U.S. 148, 153–54, 78 S.Ct. 622, 625–26, 2 L.Ed.2d 589 (1958), the Supreme Court cautioned: "We are not justified in sliding from mere disagreement with the way in which a trial court has dealt with a particular matter [of obstruction of justice] ... into a condemnation of the court's action as an abuse of discretion." I must conclude that my colleagues' judgment, and the procedure their opinion obviously suggests to witnesses who do not wish to answer questions, will make it even more difficult for federal law enforcement agencies to prosecute white collar crime.

I would affirm the order of the district court and direct that our mandate issue forthwith.